BUSH *v.* THE PERU BRIDGE COMPANY.

The right to establish public ferries resides in the legislature; and the extent of the ferry-right conferred depends upon the terms of the legislative grant.

A simple grant of a right to establish a public ferry will not be construed to be exclusive, but subject to such future grants as the public convenience may require.

The R. S., 1838, do not confer upon the first grantee of a ferry-privilege, the exclusive right to maintain a ferry at the point where the same may be established, but reserve the right to establish bridges or other ferries at the same point, when the public convenience shall require them.

The circumstance that the boards of commissioners of the several counties have authority, by law, to establish ferries, does not affect the right of the legislature to exercise that power.

An irregularity in the proceeding of the defendants in executing the writ of *ad quod damnum* authorized by their charter could only be taken advantage of by the owners of the soil appropriated by the defendants.

APPEAL from the *Miami* Circuit Court.

*Monday, November 24.*

PERKINS, J.—This was a bill in chancery by *John Bush* against the *Peru Bridge Company*, praying a perpetual injunction restraining said company from the use of their bridge, and also praying an account of receipts, &c. Bill dismissed in the Court below.

The facts material to the decision of the cause are as follows: In 1835, *Hood, Britton,* and *Williams,* proprietors of the town of *Peru, Miami* county, *Indiana,* established, under a license from the county commissioners, a public ferry " across the *Wabash* river at *Broadway* street in" said town. That ferry passed, by successive sales and purchases, through divers hands, and, finally, prior to 1842, into those of *Bush,* the plaintiff. In 1842, the legislature incorporated the *Peru Bridge Company,* by a charter containing this section:

" Sec. 6. The said corporation may erect a bridge across the *Wabash* river, at the southern termination of *Broadway* street, in the town of *Peru,* in the county of *Miami;* and the said corporation shall have, and may use, the writ of *ad quod damnum,* and all the benefits arising from the law allowing such writ, for the purpose of having condemned the necessary quantity of ground

Nov. Term,
1851.

Bush
v.
Peru Bridge
Company.

for the erection of the abutments, toll-house, and neces-sary causeways." The bridge, by another section, was to be not less than 25 feet wide.  L. L. of 1842, p. 46.

Said *Broadway* street, being 100 feet wide, was suffi-cient to accommodate both the bridge and the ferry, at its southern termination, and the particular location in it of the one or the other, does not appear to have been desig-nated by the authorizing power.

The erection of the bridge was commenced in the sum-mer of 1843, and completed in *June*, 1844.  *Bush*, having somewhat changed one, perhaps both, of his landings, to avoid interference with the bridge, continued his ferry in operation till the 27th of *May*, 1844, at which time he took off his boat and removed it to a ferry lower down the river, never after using the ferry at *Peru*.

In *June*, 1847, he filed this bill, and he seeks to sustain it upon this principle, viz., that the grant of the ferry-right to *Hood, Britton,* and *Williams,* (which right is now held by the plaintiff by assignment,) conveyed the exclu-sive privilege of transportation across the *Wabash* at *Pe-ru;* that the *Peru* bridge is a disturbance of that privi-lege, and, hence, a nuisance subject to abatement.

Waiving the question whether the remedy, if one ex-ists, should be sought in chancery or at law, we will first examine whether a wrong has been committed that can be remedied in any Court.  The right of establishing pub-lic ferries is in the legislature; and the extent of ferry-right held by any individual or company, under the legis-lature, depends upon the terms of the grant made to the one or the other.  Had the legislature made a simple, unrestricted grant of the right of a public ferry at *Peru*, to *Hood, Britton,* and *Williams,* that right would not have been construed to be exclusive, but to have been conferred subject to such further grants to other persons of right of transportation across the *Wabash* river at that place, as public convenience might require.  This point is fully dis-cussed, and, as we think, rightly decided, in the case of *Charles River Bridge* v. *The Warren Bridge,* 11 Peters, 420.—S. C., 7 Pick. 344. (1.)  The ferry at *Peru* was estab-

lished under the following statutory provision, approved February 10, 1831.  R. S. 1838, p. 302.

" Be it enacted," &c., " that the several boards doing county business shall be, and they are hereby, empowered to establish public ferries across those rivers or creeks bounding or within their respective counties, whenever they shall deem it necessary, on due application to them made; but no such ferry shall be established, unless the person making such application be the proprietor of the land on that side of such river or creek on which he wishes to have such ferry established; or when the owner or holder of any land, where the public convenience may require that a ferry should be kept, shall neglect or refuse to have a public ferry established within a reasonable time:  *Provided*, That no ferry shall be established within one mile immediately below or above a regularly established ferry, unless they shall deem it important for the public convenience, or where the situation of a town or village, the crossing of a public highway, or the intervention of some creek or ravine should render it necessary."

This statute expresses the grant of the ferry-right in question, and there is nothing in it conferring an exclusive privilege; but, on the contrary, it contains a clear reservation of the right to establish additional ferries, should the public convenience demand them, at *Peru*. True, the county commissioners are permitted to exercise this right; but the state is not thereby precluded from exercising it directly, instead of by agents, when she may see fit.   It was competent for the legislature to determine when the public convenience required additional facilities for crossing the *Wabash* river at the point in question.

Had, then, an additional ferry, or additional ferries, been established there, instead of a bridge, the act, or acts, would have been within the provisions of the contract, if contract it was, with *Hood*, *Britton*, and *Williams*, at the grant of the ferry-right to them.   We do not see that the establishment of a bridge, instead of a ferry, alters the case.   Both are within the reason and spirit of the reser-

vation. Both are but different means for the accomplishment of the same end, the accommodation of the public—the right of providing for which the state had reserved to herself. The complaint in the case, indeed, is not put upon the ground that a bridge has been authorized instead of a ferry; but upon the ground that no way, of any kind, for crossing the *Wabash* river at *Peru*, in competition with the ferry of *Bush*, could be established. This ground, as we have seen, cannot be maintained. Had, in fact, the grant of the ferry-privilege been exclusive, we incline to the opinion that it should still have been held to be subject to the right of the state, at a future time, when the increasing business and growing wants of the community might require, to authorize a *bridge* in lieu of it. But we need not now go that length.

It is objected that the proceedings by the bridge company, upon the writ of *ad quod damnum*, were irregular; but if they were so, the matter is between the owners of the soil appropriated and the company appropriating it.

*Per Curiam.*—The decree is affirmed with costs.

*D. D. Pratt, A. A. Cole,* and *I. Hartman,* for the appellant.

(1) The case cited in the text was as follows: In 1650, the legislature of *Massachusetts* granted to *Harvard College* the liberty and power to dispose of a ferry by lease or otherwise, from *Charlestown* to *Boston*, passing over *Charles* river. The right to set up a ferry between these places had been given by the governor, under the authority of the Court of Assistance, by an order dated *November* 9, 1636, to a particular individual; and was afterwards leased successively to others, they having the privilege of taking tolls regulated in the grant; and when, in 1650, the franchise of this ferry was granted to the college, the rights of the lessors in the same had expired. Under the grant, the college continued to hold the ferry by its lessees, and receive the profits therefrom, until 1785, when the legislature of *Massachusetts* incorporated a company to build a bridge over *Charles* river, where the ferry stood, granting them tolls; the company to pay to *Harvard College* two hundred pounds a year, during the charter, for forty years, which was afterwards extended to seventy years; after which the bridge was to become the property of the commonwealth. The bridge was built under this charter, and the corporation received the tolls allowed by law; always keeping the bridge in order, and performing all that was enjoined on them to do. In 1828, the legislature of *Massachusetts* incorporated another company for the erection of another bridge, the *Warren*

bridge, over *Charles* river, from *Charlestown* to *Boston*, allowing the company to take tolls; commencing in *Charlestown*, near where the *Charles* river bridge commenced, and terminating in *Boston*, about eight hundred feet from the termination of the *Charles* river bridge. The bridge was to become free after a few years, and, at the time of the announcement of the opinion of the Supreme Court of the *United States*, had actually become free. Travelers, who had formerly passed over the *Charles* river bridge from *Charlestown* square, then passed over *Warren* bridge; and thus the *Charles* river bridge company were deprived of the tolls which they otherwise would have received. The value of the franchise granted by the act of 1785, was thus entirely destroyed. The proprietors of the *Charles* river bridge filed a bill in the Supreme Judicial Court of *Massachusetts*, against the proprietors of the *Warren* bridge, first for an injunction to prevent the erection of the bridge, and afterwards for general relief; stating that the act of the legislature of *Massachusetts*, authorizing the building of the *Warren* bridge, was an act impairing the obligations of a contract, and therefore repugnant to the constitution of the *United States*. The Supreme Court of *Massachusetts* dismissed the bill of the complainants, and the case was brought by writ of error to the Supreme Court of the *United States*, under the provisions of the 25th section of the judiciary act of 1789. The judgment of the Supreme Court of *Massachusetts*, dismissing the bill of the plaintiffs in error, was affirmed.

Mr. C. J. *Taney*, in delivering the opinion of the Court, used the following language in relation to public grants:

"The rule of construction in such cases is well settled, both in *England*, and by the decisions of our own tribunals. In 2 Barn. & Adol. 793, in the case of the *Proprietors of the Stourbridge Canal* against *Wheely* and others, the Court say: 'the canal having been made under an act of parliament, the rights of the plaintiffs are derived entirely from that act. This, like many other cases, is a bargain between a company of adventurers and the public, the terms of which are expressed in the statute; and the rule of construction, in all such cases, is now fully established to be this: that any ambiguity in the terms of the contract, must operate against the adventurers, and in favor of the public, and the plaintiffs can claim nothing that is not clearly given them by the act.' And the doctrine thus laid down, is abundantly sustained by the authorities referred to in this decision. * * * * The object and end of all government, is to promote the happiness and prosperity of the community by which it is established; and it can never be assumed that the government intended to diminish its power of accomplishing the end for which it was created. And in a country like ours, free, active, and enterprising, continually advancing in numbers and wealth, new channels of communication are daily found necessary, both for travel and trade, and are essential to the comfort, convenience, and prosperity of the people. A state ought never to be presumed to surrender this power, because, like the taxing power, the whole community have an interest in preserving it undiminished; * * * and they have a right to require that the power of promoting their comfort and convenience, and of advancing the public prosperity, by providing safe, convenient, and cheap ways for the transportation of produce, and the purposes of travel, shall not be con-

Nov. Term,
1851.

Bush
v.
Peru Bridge
Company.

Nov. Term,
1851.

strued to have been surrendered or diminished by the state, unless it shall appear by plain words that it was intended to be done."

See, also, *The Proprietors of the Piscataqua Bridge* v. *The New Hampshire Bridge*, 7 New Hampshire, 35; *Backus* v. *Lebanon*, 11 id. 19; *The Enfield Toll Bridge Company* v. *The Hartford and New Haven Railroad Company*, 17 Conn. 40 and 454; *Armington* v. *Burnet*, 15 Vermont, 745; *The White River Turnpike Company* v. *The Vermont Central Railroad Company*, 21 id. 590; *The West River Bridge Company* v. *Dix*, 6 Howard, S. C., 507.