## FALL *et al. v.* THE COUNTY OF SUTTER *et al.*

21   237
147   24|

FRANCHISES for erecting toll-bridges, or ferries, being sovereign prerogatives, belong to the political power of the State, and are primarily represented and granted by the Legislature as the head of the political power. ·

Where the power of granting these franchises has been by legislative enactment delegated to subordinate tribunals, as in this State to the Courts of Sessions and Boards of Supervisors, such tribunals are only agents of the Legislature in this respect.

Grants made by these subordinate tribunals by virtue of the authority thus delegated, are equally valid as if made by the Legislature directly, and the effect of a grant by them is to give a right of property to the grantee or licensee which it is not in the power of the Legislature to divest or transfer to another, so long as the owner holds in obedience to law.

Grants of franchises of this character, not being exclusive in their terms, do not confer upon the grantees any exclusive right to the line of travel which is accommodated by them, or to its profits, and do not estop the granting power from making other grants of like character, the effect of which is to impair the value and take away the profits of the franchise first granted.

Where the grant of such franchises is not in terms exclusive, the Government

holding this power, to be exercised for the public interest and convenience, is not to be presumed to part with its right to make other grants which may impair the value of the first, and will not be held to have done so except where such an intent appears affirmatively and plainly. This intent is not shown from a mere grant of the franchise or privilege.

The provisions of the Acts of 1850 and 1855, concerning bridges and ferries, prohibiting the subordinate granting tribunals from licensing a second bridge or ferry within one mile of a former one, except under certain conditions, one of which is where a second grant is required by the public convenience, impose no restrictions upon the power of the Legislature in making other grants.

The question of what the public convenience requires, is a political not a legal one. Its decision rests with the Legislature and depends upon its discretion, the exercise of which, in the granting of a subsequent franchise, is conclusive and not reviewable in a Court of Justice.

Under the Act of 1850 concerning public ferries, the plaintiffs, in 1852, obtained from the Court of Sessions of Yuba County, a license to construct and maintain a toll-bridge across the Feather River, at a point near the city of Marysville, and constructed and have since maintained, at the point indicated, a bridge sufficient to accommodate the line of travel, and have complied with all the provisions of the law regulating franchises of this character. In 1859 the Legislature by special act granted to the defendants the privilege of constructing another bridge within six hundred feet of that of plaintiffs, and calculated to accommodate the same line of travel, and to impair greatly the profits and value of plaintiffs' franchise. Defendants having commenced the construction of a bridge under this act, plaintiffs brought this action to enjoin its completion and its use for the purpose intended: *Held*, that plaintiffs were not entitled to the injunction.

APPEAL from the Tenth Judicial District.

In 1850 the Legislature passed an act concerning public ferries, by which the Courts of Sessions of the several counties were authorized, upon proper application, to establish ferries, and to license the applicants to receive tolls fixed in amount by the Court, upon complying with the provisions of the act. Section five of the act was as follows: "No ferry shall be established within one mile immediately below or above a regular established ferry, unless it shall be deemed important for the public convenience, or where the situation of a town, or village, the crossing of a public highway, or the intervention of some creek, or ravine, shall render it necessary."

Under this act the plaintiffs, in 1852, obtained a license to build a bridge across the Feather River, near the city of Marysville, and to take tolls thereon for the period of twenty years. The bridge was constructed, and the plaintiffs have since complied with the pro-

visions of the law in all respects as to its maintenance.   In 1855 another act was passed giving the authority to establish toll-bridges and ferries to the Supervisors of the several counties, and regulating the mode in which licenses should be given and renewed and the tolls fixed, and prescribing the duties of the licensees—the regulations applying to those already in existence under the old act as well as to those to be established under the new.   Section six of this act reënacts section five of the Act of 1850, and provides further, that any application to establish a bridge or ferry within one mile of a bridge or ferry already established, shall be made to the same Board by which the first was established, and upon notice to its owners.

The nature of this action, the character of the complaint, and the subsequent proceedings, are sufficiently set forth in the opinion of the Court.   At the January Term, 1861, the Supreme Court affirmed the judgment of the lower Court, Baldwin, J. delivering the opinion, and Cope, J. concurring, which opinion is the one given below.   A rehearing was subsequently granted, the argument upon which was postponed from time to time, until the present term when, after reargument, the judgment was again affirmed, and the previous opinion adopted, by Cope, J.—Norton, J. concurring.

*S. Heydenfeldt*, for Appellants.

I.   The remedy by injunction is preventive, and plaintiff is not required to wait until the injury is complete.   (2 Story's Eq. secs. 925–928; *Bonaparte* v. *Railrood Co.*, 1 Baldwin, 205, 212, 216, 230–232;   *Osborn* v. *U. S. Bank*, 9 Wheat. 738–741, 754, 838–841; *Gibson* v. *Smith*, 2 Atkyns, 182; *Jackson* v. *Cator*, 5 Ves. 688; *Hill* v. *Miller*, 3 Paige, 254; *Whitehuste* v. *Hyde*, 2 Atk. 391; *Coats* v. *Clarence Railway*, 1 Rus. & Myl. 181; *Sutton* v. *Montford*, 4 Simmons, 559; *Back* v. *Stacy*, 2 Russell, 121; *M. & H. R. Co.* v. *Artcher*, 6 Paige, 83; *Belknap* v. *Belknap*, 2 Johns. Ch. 463; *Bathurst* v. *Barden*, 2 Bro. Ch. 64; *Robertson* v. *Pittenger*, 1 Green's Ch. 57; *Quackenbush* v. *Van Riper*, 2 Id. 353; *Case* v. *Harwod*, 3 Wend. 632; Cooper's Eq. 77.)

II.   Standing by and seeing a party expend money would exclude title to relief.   (*East I. Co.* v. *Vincent*, 2 Atk. 83; *Styles*

v. *Cooper*, 3 Id. 692; *The King* v. *Butierton*, 6 Term, 554; *Jackson* v. *Cator*, 5 Ves. 688; *Birmingham Coal Co.* v. *Lloyd*, 18 Id. 515; *Lynn* v. *Pemberton*, 1 Swamt. 246.) And no damages given for violating franchise for the same reason. (*Newburg Turnpike Co.* v. *Miller*, 5 Johns. Ch. 115.)

III. The public convenience, or some one of the statute exceptions, is a condition which must be shown. (*Commonwealth* v. *Egremont*, 6 Mass. 491; *Commonwealth* v. *Chase*, 2 Id. 170; *Commonwealth* v. *Cummings*, Id.; *Givens* v. *Pollard*, 3 A. K. Marshall, 320; *Casey & Finnie* v. *Jones*, 2 Littell, 301; *Nashville B. Co.* v. *Shelby*, 10 Yerger, 280; *Coffver* v. *Houston*, 4 Munroe, 288; *In re Hanson*, 2 Cal. 262.)

IV. Exclusive rights are always protected. (*Newburg Turnpike Co.* v. *Miller*, 5 Johns. Ch. 111; *Croton Turnpike* v. *Ryder*, 1 Id. 611; *Norris* v. *The F. & T. Co.*, 6 Cal. 590; *Benson* v. *City of New York*, 10 Barb. 223.)

*Charles Lindley*, for Respondents.

I. The law (Wood's Dig. 459) does not confer the power on the Board of Supervisors to grant an exclusive right, but expressly authorizes them to multiply bridges as the public convenience may require.

II. Whoever takes a license for a bridge receives it subject to the exercise of this reserved right of sovereignty, and in this case the plaintiffs received their license subject to the rights of the defendants. The law under which the defendants construct their bridge was passed anterior to the issuance of the plaintiffs' license in October, 1860.

III. The Legislature is the primary power to determine the question of public convenience, and it can delegate it to the Board of Supervisors and modify and revoke it at pleasure. In its discretion it determined that the public convenience required the construction of the defendants' bridge, and passed the special act in 1859 to authorize the same.

IV. The Legislature has no power to grant to the plaintiffs, through the Board of Supervisors or by itself, an exclusive right for one year either with or without perpetual right of renewal from

Fall *v.* County of Sutter.

year to year. (*Charles River Bridge Company* v. *Warren Bridge Co.*, 11 Pet. 548; *Hartford* v. *East Hartford*, Id. 534; *Ohio Life Ins. Co.* v. *De Bolt*, 16 How. 431; *State Bank of Ohio* v. *Knapp*, Id. 369; *Indian Cañon Road Co.* v. *Robinson*, 13 Cal. 519; *Bush* v. *Peru Bridge Co.*, 3 Ind. 21; 18 Conn. 451.)

I state as a legal principle that the Legislature has not power under the Constitution to vest, or cause to be vested, in an individual the exclusive right to control, provide for, and tax the public travel. The establishment and perpetual supervision of public highways, ferries, and bridges, to accommodate and facilitate the public travel, are matters of great political or public concern, and are rights and duties incident to sovereignty. This sovereign power, so indispensable to the Government, has been delegated to the Legislature by general warrant, and like all other delegated powers is a trust which the trustee can neither sell, diminish, or abandon.

The *Charles River Bridge* v. *Warren Bridge* (11 Pet. 420) was a cause growing out of a bridge charter claimed to be exclusive for seventy years. It involved vast rights to toll and travel, which had mostly grown up in the development of the country after the passage of the charter. Upon this branch of legislative power, Justice Taney, delivering the opinion of the Court, held as follows:

"It may perhaps be said that in the case of the Providence Bank, the Court were speaking of the taxing power, which is of vital importance to the existence of every Government; but the object and end of all government is to promote the happiness and prosperity of the community by which it is established, and it can never be assumed that the Government intended to diminish its power of accomplishing the end for which it was created. *And in a country like ours—free, active, and enterprising—continually advancing in numbers and wealth, new channels of communication are daily found necessary both for travel and trade, and are essential to the comfort, convenience, and prosperity of the people.* A State ought never to be presumed to surrender *this power*, because, like the *taxing power*, the whole community have an interest in preserving it undiminished; and when a corporation alleges that a State has surrendered for seventy years its power of improvement

and public accommodation, in a great and important line of travel along which a vast number of its citizens must daily pass, the community have a right to insist that its abandonment ought not to be presumed in a case in which the deliberate purpose of the State to abandon does not appear. The continued existence of a Government would be of no great value if by implications and presumptions it was disarmed of the powers necessary to accomplish the ends of its creation, and the functions it was designed to perform transferred to the hands of privileged corporations." The rule of construction announced by the Court was not confined to the *taxing* power, nor is it so limited in the opinion delivered; on the contrary, it was distinctly on the ground that the interests of the community were concerned in preserving, undiminished, the power then in question; and whenever any power of the State is said to be surrendered or diminished, whether it be the *taxing* power or any *other* affecting the public interest, the same principle applies and the rule of construction must be the same.

A series of cases arose under a general Banking Law of the State of Ohio, wherein it was claimed that the Legislature had authority to surrender by contract the taxing power on bank capital; and having the power, had so exercised it. The first is the case of the *Ohio Life Ins. and Trust Co.* v. *De Bolt* (16 How.) In this case Chief Justice Taney, in delivering the opinion of the Court, held as follows:

" The powers of sovereignty confided to a legislative body are undoubtedly a *trust* committed to them, to be executed to the best of their judgment for the public good, and no one Legislature can by its own act disarm their successors of any of the powers or rights of sovereignty confided to the legislative body, *unless they are authorized to do so by the Constitution under which they are elected.* They cannot, therefore, by contract deprive a future Legislature of the power of imposing any tax they may deem necessary for the public service, or of exercising any other act of sovereignty confided to the legislative body, *unless the power to make such contract is conferred upon them by the Constitution of the State;* and in every controversy on this subject the question must depend upon the Constitution of the State, and the extent of the power thereby conferred on the legislative body."

Fall *v.* County of Sutter.

Four of the Judges, to wit: Justices McLean, Curtiss, Nelson, and Wayne, hold that the Legislature, under a general power of legislation, can transfer to an individual a part of that power. Justices Taney and Grier hold that the Legislature cannot transfer any part of such power unless authorized so to do by the Constitution, and that this authority must be expressed or implied from circumstances of great force, as fifty years acquiescence on the part of the executive, legislative, and judicial departments of a State Government; while Justices Catron, Campbell, and Daniel hold that the power to surrender or transfer the trust cannot be implied, that it must be expressed, or it cannot exist.    Thus it is seen that five of the Judges (a majority) concur in the principle which must govern this case, and four dissent.

The opinion of Justices Taney and Grier, proceeded upon the ground that fifty years of continued and uninterrupted acquiesence on the part of all the departments of the State Government, was sufficient to imply it; but here no such practice can be pleaded. It has been the other way; ferries and bridges are granted upon the condition that other grants may be made, provided the public convenience requires it.

There is no precedent upon this point in the judicial department of our Government, but the legislative department, in the general ferry and bridge laws, has kept an eye single to the preservation of this control over the public travel, and provided that in all cases when the public convenience demands it, additional facilities may be furnished.    Section six of the general law is as follows: No ferry, or toll-bridge, shall be established within one mile above or below a regularly established ferry, or toll-bridge, unless it be required by the public convenience, or where the situations of a town or village, or the intervention of some creek, or the crossing of a public highway, shall render it necessary.    (Stat. 1855, 184.)

Our Constitution nowhere expressly vests the legislative department with power to transfer by compact the trust delegated, or any part thereof, or to bind any subsequent Legislature upon matters of purely public or political concern.    After the special inhibitions, (Sec. 21, art. 1) it provides that " this enumeration of rights shall not be construed to impair or deny others retained by the people."

The right to have the trust executed, and not sold or abandoned, must be included in this general reservation.

In *Hartford* v. *East Hartford*, (10 How. 534)—ferry case—in speaking of legislative duties, the Court say: "It can neither devolve these permanently upon other public bodies, nor permanently suspend or abandon them itself, without being usually re-regarded as unfaithful and indeed attempting what is *wholly beyond its constitutional competency*."

"From the standing and relation of these parties, and from the subject matter of their action, we think that the doings of the Legislature as to this ferry must be considered rather as *public laws*, than as contracts. They relate to public interest. They changed as those interests demanded."

The case of *Norris* v. *Farmers and Teamsters' Co.* (6 Cal. 594) neither directly nor by implication denies the power to pass the act under which defendants construct their bridge. That case simply holds, that a company of private citizens could not, without legislative authority, establish a free ferry so as to interfere with a ferry established by and under such authority. The Court says: "The public grant of franchise of this kind should be protected by being held to be exclusive in the grantee, unless legally and duly ordered otherwise by the public authorities." Again: "the law will not sanction the establishment, without authority, of a ferry so contiguous to the plaintiff's bridge as to destroy the profits." The Court is especially urged to examine the case of *Bush* v. *Peru Bridge Co.* (3 Ind. 21).

*Heydenfeldt*, in reply.

I. The leading question is, whether the franchise of the plaintiffs is an exclusive right. And here I beg to observe, that the authorities cited by the respondents have no analogy whatsoever to the case at bar. The facts are entirely and gravely different, and it is hoped that it will not be considered importunate to ask of the Court to apply that just degree of discrimination which is necessarily demanded by the different language used in the terms of the grant or right between this case and those which have been cited.

In the *Charles River Bridge case* (11 Pet.) there is not a

single word from which can be derived an expression of exclusiveness in the grant, and in the elaborate dissenting opinion of Judge Story he does not pretend that his doctrine of exclusive right is drawn from any expression in the grant, but only implies it from the nature of the grant and the peculiar character of its subject matter.

In the case of *Bush* v. *Peru Br. Co.* (3 Ind. 21) the discretion of determining the question of public convenience is expressly vested in the County Board, so that whoever takes, does so with explicit knowledge that he takes subject to be rivaled by the exercise of this irrevisable discretion. The language of the Indiana statute is thus: " *provided,* that no ferry shall be established within one mile immediately below or above a regularly established ferry, unless they (the Board) shall deem it important for the public convenience," etc.

The language of the California statute is as follows: " Sec. 6. No ferry or toll-bridge shall be established within one mile above or below a regularly established ferry or toll-bridge, unless it be required by the public convenience."

It will thus be seen in the first place, that our case differs from the Charles River Bridge case in that we have the express grant of exclusive right within a mile above or below, so that the reasoning in that case has no application or relationship whatever to this.

II. Having thus established the exclusive right, subject only to be defeated by the public convenience, the remaining inquiry is, how is this requisition to be determined ? Is it a condition which rests upon facts, and to be established like any other fact ? Or is it dependent upon the mere opinion of the granting power ? In determining this question it is first insisted that the rule of construction must be the same as it is in a contract between private individuals. In the case of *Hyman* v. *Read* (13 Cal. 444) this Court held, that " legislative grants are to be construed liberally in favor of the grantee ; " and the following is some of the language used in the opinion : " What reason is there that our legislative acts should not receive a similar interpretation ? Is it not at least as important in our free Government that a citizen should have as much security for his rights and estate derived from the grants of

the Legislature as he would have in England ?    What solid ground is there to say that the words of a grant in the mouth of a citizen shall mean one thing and in the mouth of the Legislature shall mean another thing ? "   " The words are the words of the Legislature upon solemn deliberation and examination, and debate. Their purport is presumed to be known, and the public interests are watched and guarded by all the varieties of local, personal, and professional jealousy."

Smith says : "A contract entered into between a State and an individual, or between a State and a corporation, is as fully protected as a contract between two individuals." (Smith's Comm. 385, sec. 253.)   Again: "A constitutional act of legislation which is equivalent to a contract, and is perfected, requiring nothing further to be done, is a contract executed, and whatever rights are thereby created a subsequent Legislature cannot impair." (Id. 385, sec. 252.)

We stand, then, before the Court with an executed contract, for which we have paid a valuable consideration, and, therefore, insist that the conditions which are to defeat us must be explicitly found as matter of fact, and that it is contrary to the nature of a contract that its dissolution or destruction should rest within the mere opinion or discretion of one of the contracting parties ; that this cannot be so, in the nature of things, unless the language is so explicit as to admit of no other interpretation ; that the language in this case not only admits of a different interpretation, but its plainest and simplest import points to the interpretation which we urge.

In adopting the Act of 1855 there must have been considerations of policy which governed the Legislature.   Ours was a new, extensive, and undeveloped country, growing rapidly, and with limited conveniences ; money was scarce and dear, and it required strong and sufficient inducement to engage our citizens in enterprises which were precarious and doubtful.   It was only when the certainty of protection and the hope of large profits beguiled them away from the ordinary paths of commercial pursuits that they were found speculative enough to undertake works by which, if they derived large benefits, they conferred still larger benefits upon the country.   It was this last consideration that operated upon the Leg-

Fall *v.* County of Sutter.

islature to grant the desired protection to the parties who would undertake these risks.   Without protection, especially from disastrous and unhealthy competition, they would not have moved a hand.   They were then told that their rights should be exclusive, and that no one should compete with them, " unless it be required by the public convenience."   They received these words according to the ordinary acceptation of men—it was a condition they might accept or refuse ; they looked at the work and its cost; they investigated the locality ; they cast the horoscope of probabilities as to condition ; and, indeed, if the public convenience demanded another bridge, it was a corollary that theirs would not be the less profitable—for that would imply such a growth of population, trade, and travel as would make their share of it fully equivalent to what they anticipated in the present.   But the great point was, that the public convenience was a fact, and a fact to be ascertained like any other fact.   Upon this they rested, and surely this was the intention of the Legislature—if it was not, then it was language calculated to beguile and delude ; and if it was to be left to the mere will of one of the contracting parties to decide this condition, no one would have been foolish enough to have invested a dollar in such an undertaking.   But this Court ought to decide that the intention of the Legislature is as we construe it, because :

1. The policy of inducing these works would have suggested that much protection as a dictation of wisdom and prudence.

2. The language is clearly susceptible of that construction.

3. That would be the received construction according to the ordinary acceptation and understanding of mankind.

4. The construction is the only one which can do effective justice, which can exhibit a proper regard for the rights of property, and prevent a vandal spoilation.

5. If one of the parties to a contract use language which has the effect of misleading or deceiving the other, he should be held to a construction which would prevent his taking advantage of his own wrong.

The authorities all go to show that these conditions are facts, judicial facts, which must be determined by evidence, and I have not been able to find a single decision to the contrary upon a stat-

ute similar to ours.    ( *Givens* v. *Pollard,* 3 A. K. Marshall, 320 ; *Casey & Finney* v. *Jones* 2 Littell, 301 ; *Cotton* v. *Houston,* 4 Mowr. 288 ; see *Carter & Arnold* v. *Rufus & Notts,* 6 Dana, 46.)

It may be said that in the foregoing cases the condition which would go to defeat the exclusive right depended upon facts which could be ascertained, and, therefore, differs from the condition of " the public convenience."

To this there are several replies : 1st. These facts must not only exist, but must be cogent enough to render a ferry necessary, so that it comes at last to the same status as " the public convenience." 2d. It is certainly competent for the Legislature to make the condition of " the public convenience " a fact to be judicially ascertained ; and they have done so by classing it with the other conditions which are : " the situation of a town or village," the crossing of a public highway, and the intervention of some creek or ravine.

But in Massachusetts the very question has been repeatedly decided, and the Court of Sessions there, before establishing a road, are obliged to adjudicate that it is " of common convenience and necessity."    In *Comm.* v. *Egremont* (6 Mass. 491) the Court say : " Before the appointment of a locating committee, an adjudication ought to have been made, that the way prayed for was of common convenience or necessity."    (See also *Comm.* v. *Cumings,* 2 Mass. 170 ; *Comm.* v. *Sawin,* 2 Pick. 547.)

These decisions establish beyond a doubt : 1st. That the condition of the public convenience enters into the right.    2d. That it is a fact.    3d. That it is a fact to be judicially ascertained.    4th. That unless it is judicially ascertained, the rights of a party claiming against it are preserved.

This would seem to solve the whole question.    For if the Legislature makes the State a party to a contract by which it confers a right, which is executed and vested, and which can only be defeated by a contingency, it necessarily makes that contingency, whatever it is, subject to determination by judicial power, and yields up the privilege of determining for itself a right which is totally inconsistent with and repugnant to the position of a party to the contract.    The cases show that there is no difficulty in having this

question judicially determined, and the Courts are required to adjudicate upon it. It seems it can be found and determined as a fact just as well as any of the other facts which are classed with it, as sufficient causes for defeating the same right. Suppose that the allegation of the defense was, that the new bridge was rendered necessary by " the intervention of some creek or ravine." Can it be said that the Legislature should have the power to determine this question. There may be in fact no creek or ravine whatever, could one be established *pro hac vice*, by the act of the Legislature ? And would a party's vested estate be taken away by a mere constructive ravine ? I apprehend the Court would say that the fact must exist, and if it does not, the proprietor would be protected. And yet this fact is only one of a class to which belongs the one we are considering, to wit: " the public convenience." Then if they are classified together, and if the one is susceptible of ascertainment, just as is the other, why make a distinction, and say that the Legislature shall have the power *ex parte* to determine the one, but no power to decide the other.

I have shown from the highest authorities that the contract is to be construed in the same manner, and by the same rules, as if it were between two individuals. For when the State does business with a citizen, she does not for the purposes of any advantage take into the negotiation her mantle of sovereignty. She reduces herself to the citizen's garb, uses the citizen's language, and deals with him as an equal. Can it, then, be said, when her contract is to be construed, that she claims rightly that her sovereign position is to be considered as an element entering into the construction ? And yet this is what the respondent assumes for her in this case. In answer to the question, who is to determine the public convenience ; it is said to be that body to whom the public welfare is committed, to wit : the Legislature. Such a doctrine would be totally destructive of every vested right obtained by legislative grant. If the State can avoid the consequences of her contracts by setting up her sovereign power over the public weal, her very right arm of power to promote the public good is gone forever. It is only by an adherence to the " *uberrima fides* " that she can win the confidence of her citizens to engage in enterprises neces-

17          *

sary to the public well being, and if in doing so, she temporarily surrenders a portion of her local control, she has obtained full value for it in the advancement of the public interests, and has only done what all States and nations have done before her, and are doing every year.

Although the Legislature (which is not the State, but only one of her departments of government) is charged with the general power of promoting the public convenience, yet it has given up the right of doing so in this case, by stipulating it as a condition of the contract, by classing it with other conditions, which are undoubtedly facts to be judicially determined, and by entering into a contract which requires in case of dispute a common Judge between the parties, and repels the idea that a party can be a Judge in his own case.

In conclusion, public policy, justice, and integrity, private interests, the wants of an advanced civilization, and judicial authority, all concur in demanding the construction which is here sought.

BALDWIN, J. delivered the opinion of the Court—COPE, J. concurring.

This bill was filed to restrain the defendants from building and setting up a free bridge over the Feather River, at or near Marysville. The ground of complaint is, that the plaintiffs are the owners and possessors of a licensed toll-bridge near by. The plaintiffs aver that the franchise was acquired in 1852 by the plaintiff Hanson; that since the acquiring of the franchise the holders thereof, assigns, etc., have done everything required of them by law; that all the franchises, property, etc., in connection with the bridge, have been held by the present plaintiffs since 1855; that in 1852 plaintiff Hanson and cocorporators, under the name of the Yuba City and Marysville Bridge Company (having been previously organized as a corporation in this name) made due application to the Court of Sessions of the county of Yuba for authority to construct their bridge, and duly observed and fulfilled all the terms and requirements of the law; and on the fifth of October, 1852, that Court, by order, granted to the corporation authority to construct and a license to keep the same and collect the tolls thereon

for twenty years; that the corporation did construct the bridge at great cost, and fulfilled the various provisions of law prescribing the duties of owners of bridges; that the corporation obtained renewals annually of the license from the Court of Sessions until this power was taken from that Court, and afterwards obtained such renewal from the Board of Supervisors since the change of the law giving this power to such Boards—paying license fees, and conforming to the laws in this respect; that the last of these licenses was granted for one year from the sixth day of August, 1860, when the plaintiffs executed bonds, and did the other things required of them to perfect their right. The bill further avers, that the defendants are proceeding to destroy the rights of the plaintiffs by the erection of a bridge across the Feather River, and within six hundred feet of the toll-bridge, which will prove utterly destructive of the value of the franchise of the plaintiffs. This is done under the color of the Act of the Legislature, passed April 11th, 1859, which grants the right and privilege to the County of Sutter of constructing and keeping across Feather River a bridge for public use, extending from Fifth Street of the city of Marysville, in the county of Yuba, to the opposite bank of the river, the cost of the bridge to be paid for partly by private subscription and donations, and partly by warrants to be drawn on the County Treasurer of Sutter County, and on a fund therein styled the Bridge Fund, and "when said warrants are paid by toll derived from said bridge, then said bridge shall be free for all crossings of persons or property." The bill goes on to aver, that the plaintiff's bridge is, in every respect, sufficient for the public wants and convenience, and that the new bridge is not needed for public or private accommodation.

The Judge of the County Court of Sutter having denied an injunction upon this bill, the plaintiffs below appeal from this order; and counsel, waiving technical objections, have desired that the case thus made be decided upon its legal merits.

We do not consider it necessary to criticise very closely the provisions of the Act of 1850 or 1855 in reference to bridges, ferries, etc., to determine whether the rights of the plaintiffs are governed by the first or last of these statutes, or both together; nor is it necessary to decide the question of the power of the Legislature to

divest itself, by way of grant, of the right to make any further or other grant of a ferry or bridge franchise, so as to interfere with the business or profits of the one first granted. For it is not pretended that any express grant was made to the plaintiffs here to this effect. The Acts of 1850 and 1855, while they empower the Court of Sessions in the one case, and the Board of Supervisors in the other, to grant this franchise, do not purport to make the grant in exclusion of the right of the State, or the Board, or the Court, to grant to any one else a franchise for a bridge or ferry in the same neighborhood, or so situated as to interfere with the first. These franchises, being sovereign prerogatives, belong to the political power of the State, and are primarily represented and granted by the Legislature as the head of the political power; and the subordinate bodies or tribunals making the grants are only agents of the Legislature in this respect. But the delegation of these powers to these subordinates in no way impairs the power of the Legislature to make the grant. The effect of the grant is unquestionably to give a right of property to the grantee or licensee; and it would not be in the power of the Legislature to divest this property or transfer it to another person, so long as the owner held in obedience to the law. No attempt is made to divest *this property*, or to destroy or impair *this franchise*. What the appellants contend for is, that not only have they this property and this franchise, but they have also the right to insist that no other franchise of like kind shall be granted, the effect of which would be to *impair the value and take away the profits* of their own; in other words, that their grant is of the exclusive right to the profits of the travel in the neighborhood—at least within the distance of this bridge to their own. We think the rule is settled to the contrary at this day. Ever since the great case of the *Charles River Bridge Company* v. *Warren Bridge Company*, (11 Pet. 548) these grants have been held not exclusive—as granting a right, but not as estopping the granting power from making other grants, though the effect of the last be to destroy the profits of the first. (See, also, *Hartford* v. *East Hartford*, 11 Pet. 534; *Bank of Ohio* v. *Knapp*, 16 How. 369; *Bush* v. *Peru Bridge Co.*, 3 Ind. 21; *Indian Cañon Road* v. *Robinson*, 13 Cal. 510.)

Fall *v.* County of Sutter.

The question is very fully considered in the cases of the Supreme Court of the United States and in the case of 3 Indiana. The reasoning upon which the conclusion negativing the claim of the grantee goes is, that the grant is not *in terms* a grant of an exclusive right; and that the Government holding this power, to be exercised for the public interest and convenience, is not to be presumed to part with it; but the intent to do so must affirmatively appear, and be plain and manifest, and that this intent is not shown from a mere grant of the franchise and privilege, this grant being effectual to show that the Legislature had given the particular right to one grantee, but not proving that the Legislature had divested itself of all power to grant in the same vicinity to any other.

It is not necessary to criticise the particular language of the Act of 1850 ; for supposing that the limitations and provisions applicable to the Court of Sessions apply to or control the Legislature, and supposing further, that the rights of the appellants rest under and are protected by that act—suppositions which we make only for the argument—still, by the Act of 1850, there is no grant of an exclusive right. It is true, the Court of Sessions could by that act only grant another bridge or ferry franchise—after the first had been granted—in certain contingencies, the public convenience being one ; but the question is, who is to judge of the public convenience, or whether a given thing is for that convenience. The answer is, that body or power to whom the public welfare is committed with the general power to provide for and promote it. Public convenience, in this sense, is not a fact so much as it is a conclusion, or matter of judgment, or of expediency, and it is the same thing as if the word interest or policy were used, the effect of which would be to make the action of the granting power to depend upon its discretion, which probably could not be reviewed in a Court of Justice. It would be peculiarly a matter of political regulation, not a fact for legal ascertainment.

While it may shock our notions of a true conservatism that the Legislature should, as the facts represent them to have done here, be allowed to deal harshly with individual rights, after having authorized and encouraged an enterprise, leading necessarily to the expenditure of a large sum of money upon the faith that the profits

should be suffered to be enjoyed without legislative interruption; still this seems, under the law, as it is written, to be one of those evils—if it be one—for which the Courts can furnish no corrective.

Judgment affirmed.