## THE BINGHAMTON BRIDGE.

1. Where a party to a suit sets up that under one statute a State made a contract with him, and that by a subsequent statute it violated the contract, and the highest court of law or equity of a State has held that such subsequent act was a valid act and decreed accordingly, the jurisdiction of this court under the 25th section of the Judiciary Act of 1789, attaches.

2. The statute of a State may make a contract as well by reference to a previous enactment making one, and extending the rights, &c., granted by such enactment to a new party, as by direct enactment setting forth the contract in all its particular terms. And a third contract may be made in a subsequent statute by importation from the previously im-

ported contract, in the former statute, and a fourth contract by impor-
tation from a third.

The doctrine applied by the court to a somewhat nice case before it.

3. An enactment by a State, in incorporating a company to build a toll-
bridge and take tolls fixed by the act, that it should not be lawful for
any person or persons to erect any bridge within two miles either above
or below the bridge authorized, held to be within the case of the
*Dartmouth College* v. *Woodward* (4 Wheaton, 625), and a contract in-
violable; this though the charter of the company was without limit as
to the duration of its existence.

4. A clause in a statute "that it shall not be lawful for any *person or per-*
*sons* to erect a bridge within a distance of two miles" means, not only
that no person or association of persons shall erect such a bridge with-
out legislative authority; but that the Legislature itself will not make
it lawful for any person or association of persons to do so by giving
them authority.     .

THE legislature of New York was desirous in early times
to have turnpike communications from the Chenango River,
in the interior of the State, as the river approaches the Penn-
sylvania line, to the Hudson River at and below Newburgh,
on that stream. Roads from the one river to the other by
the routes contemplated had to cross the east branch of the
Susquehanna, the east and west branches of the Delaware,
and it was proposed also to make a bridge westward across
the Chenango River itself. Accordingly, on the 6th of April,
1805, the legislature passed an act to establish a "turnpike
corporation," as it was called, for these purposes. The act
was a very long one—forty-two sections—and for the pur-
pose of a subdivision of labor, created in fact some four or
five corporations. Among them a company for the purpose
of building, by subscription of capital, bridges over the *west*
and *east* branches of the Delaware River, was incorporated
by the name of "The President and Directors of the *Dela-*
*ware* Bridge Company." The sections of the act relating
to this company, fifteen in number, besides incorporating
company *in form*, with the usual incidents, "continual suc-
cession," "suing," &c., gave it the right of purchasing,
holding, and conveying any estate, real and personal, neces-
sary to fulfil the end and intent of the corporation. They
prescribed the mode of organizing the company, the kind of

bridge to be built, the places where toll-gates should be put, the amount of tolls to be taken after the judges of Delaware County should declare that the bridge was finished, the duty of care and superintendence of the bridge, and the penalty (forfeiture of charter) of neglect to repair or rebuild it if out of order or carried away; the punishment to be inflicted on any one who wilfully injured it, &c., &c.

Power was given to the directors to increase the stock of the company from time to time, after the original capital had been expended, as the exigency should in their judgment require, by assessments on the old shares, and to collect it, with a right of forfeiture of the old shares, if not paid, and shares in the corporation were made personal property.

The 31st section enacted:

"*It shall not be lawful for any person or persons to erect any bridge, or establish any ferry across the said west and east branches of Delaware River, within two miles either above or below the bridges to be erected and maintained in pursuance of this act.*" . . . "*Provided,* nevertheless,*" the act went on to say, "*that nothing herein contained shall be construed to prevent any person, residing within two miles of the said bridges, from crossing the said river to or from his or her own house or land with his or her own boat or craft, without being subject to the payment of any toll.*"

An additional—the 36th—section provided that, at the expiration of thirty years, *the bridge should become the property of the people of this State.*

So far as regards the *Delaware* Bridge Company.

A subsequent part of the same act—its 38th section—incorporated another company — a single company — "The *Susquehanna* Bridge Company," for the purpose of erecting a bridge across the Susquehanna, at what was then called Oquaga, and since Windsor; and *also* for erecting a bridge at Chenango Point, the now village of Binghamton.

This section enacts, among other things, that the persons named, their successors and assigns,

"Shall be and are hereby created a body politic, and by the

name of ' The Susquehanna Bridge Company,' their successors and assigns *shall be and hereby are invested with all and singular the powers, rights, privileges, immunities, and advantages, and shall be subject to all the duties, regulations, restraints, and penalties which are contained in the foregoing incorporation of the Delaware Bridge Company ; and all and singular the provisions, sections, and clauses thereof, not inconsistent with the particular provisions herein contained, shall be and hereby are fully extended to the president and directors of this incorporation."*

The charters of these bridge companies—inserted, as already mentioned, in the body of the act incorporating the road—were prefaced by this preamble.

"Whereas, the foregoing road incorporation cannot be sufficiently carried into effect, or the public convenience fully promoted, if durable and permanent bridges across the Susquehanna and Chenango rivers, and the east and west branches of Delaware River, at the several places of intersection of the said roads, are not at the same time erected and maintained. And whereas, by reason of the great expense necessarily to be incurred in erecting and maintaining such bridges, on account of the size and rapidity of those streams, and the extraordinary freshets and frequent obstructions happening in those rivers; to which such bridges will be exposed, and which will endanger their permanency and durability, and may call forth a frequent renewal of the whole capital required for rebuilding such bridges, and therefore require a power (not contained in the foregoing incorporations) of calling from the stockholders, from time to time, such sums as shall be required for upholding such bridges, and which equally forbid the policy incorporated in the foregoing incorporations, that said property shall revert to the State; and whereas it is suggested that it will be most expedient for the purposes aforesaid to make two separate and distinct bridge incorporations, with powers adequate to the accomplishment thereof in the best possible manner. Therefore,

" *Section* 23. Be it enacted," &c.

On the 1st April, 1808, the Susquehanna and Chenango bridges not being yet built, *another* act was passed amendatory of the old one. It ran in substance thus:

" *Section* 3. *Be it enacted*, That the incorporation of the Sus-
quehanna Bridge Company shall hereafter be deemed and con-
sidered to exist for the sole purpose of erecting and maintaining
a toll-bridge, under their said charter, across the *Susquehanna*
River at Oquaga, under its present provisions, *except the limi-
tation of its duration of thirty years, which said limitation shall be
and hereby is repealed;* and that the time within which it shall be
built shall be and hereby is extended to four years from the
passing of this act.

" *Section* 4. *And be it further enacted*, That for the purpose of
erecting and maintaining a toll-bridge across the *Chenango* River,
at or near Chenango Point, the present stockholders of the *Sus-
quehanna Bridge* Company, or such others as shall associate for
that purpose, shall be and hereby are created a body corporate,
in fact and in name, by the name and style of ' The *Chenango*
Bridge Company,' and as such to have perpetual succession,
under all the *provisions, regulations, restrictions, clauses*, and *pro-
visions*\* of the before-mentioned Susquehanna Bridge Company."

Under this last section, several persons consociated them-
selves, in 1808, under the name of the *Chenango* Bridge
Company, and built a toll-bridge at Chenango Point, *about
one hundred rods above the point at which that stream merges
itself and is lost in the larger and more important Susquehanna.*

In 1805, when the first act was passed, Chenango Point
had but two or three houses, was a small place every way;
hard, comparatively, of access; and with a surrounding re-
gion sparsely populated. Matters were not much different
in 1808 when the second one was passed. In the course of
fifty years, the condition of things had changed. Popula-
tion had increased. The New York and Erie and other
railways ran near the place. Villages had sprung up around.
In 1854, several persons, "inhabitants of the village of Bing-
hamton and its vicinity," presented a petition to the legis-

---

\* This act of 1808, as given in the printed copies of the record before the
court, read as given above with the word "provisions" inserted twice. In
one of the opinions given below and submitted in the argument here, the
act was cited as reading, "under all the provisions, regulations, restrict*ing*
clauses, and provisions."

lature of New York, praying for the passage of an act authorizing an additional bridge. Their petition set forth :

"That the said village, situated at the confluence of the Susquehanna and Chenango Rivers, has a population of about ten thousand persons. That it covers the point between the rivers, and extends to the opposite side of both. That since the construction of the New York and Erie Railroad, which crosses the Chenango River about one mile from the mouth, the village has rapidly extended up said river, on both sides, and has largely increased, particularly upon the westerly side.

"They represent that the depots of all the railroads are on the easterly side of the Chenango, above where it is proposed to place the new bridge; that the said railroad depots occasion much travel to and from them, to and from the westerly side of the Chenango River, and that those who would cross in the vicinity of said depots are compelled to go nearly one-half mile down the Chenango River, and up it again on the other side, to and from the depots, thus losing nearly one mile of travel upon every such occasion. That a large volume of travel constantly passes over said old Chenango bridge, so great that it is frequently blocked up, by waiting for some to pay toll and otherwise, to the hindrance of travellers and citizens, and especially upon public days and funeral occasions. That all the churches, except the Catholic, are situated, and the principal business streets are upon the easterly side of the Chenango, and that the new, and hereafter to be principal public cemetery is situated upon the westerly side of the Chenango, about one mile above the old bridge. That the river is subject to high freshets and ice floods, and that in case the present bridge across the Chenango should be carried away there would be no means but a railroad bridge, where travel is not permitted, of reaching said churches, nor the business street from the westerly side of the Chenango, or the cemetery from the easterly side, nor could numerous citizens who reside upon the westerly side of the Chenango reach their places of business. That by reason of the great amount of travel over the present bridge and other causes it is frequently out of repair, so that only one side of it can be used, and at such times it is passed only with great delay and difficulty."

The legislature of New York accordingly, by "An act to incorporate the Binghamton Bridge Company," passed April 5, 1855, granted a charter to another bridge company, who built a bridge a few rods above the old one. This greatly diminished and seemed likely to destroy its tolls, which had been for a long time profitable.

The old bridge company now accordingly filed a bill in the Supreme Court of New York to enjoin the new rival.

The bill—resting itself, of course, on the postulate that the rights given by the act of 1805 to the Delaware Bridge Company were imported by the 38th section of it into that of the Susquehanna Company of that act; that these again, thus imported, were translated (with the thirty-years restriction only thrown off) into the third section of the act of 1808, and that these last were carried finally into the fourth section of this new act—insisted that these various enactments made an " absolute, unconditional, and unlimited *contract*" with them that no bridge should ever be built over the Chenango River within two miles of theirs, either above or below it.

The answer denied the contract set up.

The Supreme Court of New York dismissed the bill. On appeal, the Court of Appeals, the highest court of the State of law or equity in which a decision of the matter could be had, affirmed the decree. The case was now brought here for review; the matter coming here, of course, under the 25th section of the Judiciary Act of 1789, which provides that a final judgment or decree in the highest court of law or equity in a State, "where *is drawn in question the validity of a statute of any State on the ground of its being repugnant to the Constitution of the United States, and the decision is in favor of such validity,* may be examined and reviewed in this court;" and the allegation being that the act of April 5, 1855, incorporating the new bridge company, was contrary to that clause of the Constitution of the United States which ordains that " no State shall pass any law impairing the obligation of contracts."

The certificate from the Court of Appeals declared that

the question raised by the Chenango Bridge Company, appellants in the case was:

"That the said act of April 5, 1855, was repugnant to the Constitution of the United States; and the question decided by this court, *in order to induce the judgment of this court,* was, that the said act of April 5, 1855, was not repugnant to the Constitution of the United States, and that said act of April 5, 1855, is held valid and binding by this court, notwithstanding said act was drawn in question in this cause, and the question clearly raised therein that said act was. void as aforesaid."

It was then "ordered that the record and proceedings be remitted to the Supreme Court," here to be proceeded upon according to law.

Three questions were made here:

1st. A preliminary one, not very much pressed, whether the certificate gave this court jurisdiction under the 25th section of the Judiciary Act?

2d. Did the acts of 1805 and 1808 give the complainants an exclusive and perpetual privilege against anybody; either individuals or legislature?

3d. Supposing that under the expression "it shall not be lawful for any *person or persons* to erect any bridge" it gave them such privilege as against individuals, did it give them such right as against the legislature also?

[To understand fully the argument on this third point, it must be stated, that it was assumed in the argument by the Chenango company's counsel, and was stated as a fact in some of the opinions below, that in 1797 an act was passed providing for the opening and construction of highways and *bridges,* by superintendents and commissioners of highways; and that in the same year provision was made to authorize and regulate ferries within the State—forbidding the establishing and use of any ferry, for profit and hire, unless duly authorized, and conferring authority upon the courts of common pleas in each county of the State to grant licenses for keeping ferries, as many and to such persons as the court shall think proper.]

*Mr. D. S. Dickenson, for the Binghamton Bridge Company, and against the jurisdiction and exclusive privileges.*

I. Whatever the certificate may state, it is obvious that the real question below was whether the acts of 1805 and 1808 made a contract exclusive as against the State. Supposing such a contract, there could be no doubt that the act of 1855 impaired it. The decision below was that they did not make it. The decision then was an adjudication of a State court upon a statute of the State; and construing it. Such a case is not one within the 25th section. It may be said, however, that this point has been otherwise adjudicated in *Bridge Proprietors* v. *Hoboken Company.** If that is so, there remain other grounds for dismissing the case.

The certificate states that "*in order* to induce the judgment of *this*" (the Supreme Court of the United States), the question decided below, was thus and so. Can cases thus be decided in a particular manner, for the purpose of bringing them here, under the 25th section, and then be *certified* into jurisdiction? The purpose of the act was not to have anything brought here which was not decided for the purposes of justice in the case; cases decided merely to get a review by this tribunal, however decided, are not proper matters for its jurisdiction. Jurisdiction cannot be "manufactured," and authority thus given, even to this court, to review the legislation and judicial proceedings of a State, which ordinarily belong to the State courts alone, and should rest there.

II. We concede that the legislature may, by a clear manifestation of its intention to do so, make dispositions of matters which are proper subjects of its disposition. It may sell all which is the subject of bargain. But its sovereignty cannot be vended *in perpetuo*. One legislature cannot place the sovereignty of the State or any portion of it beyond the reach of all succeeding ones.

A disposition of that in which the supremacy of government rests, is an assumption of power not legislative in its

---

* 1 Wallace, 116.

nature and is void. The legislature here has disposed of the right of passing a great river for four miles. If it can dispose of it for four miles, it can do so for a hundred, and when the principle is admitted, what is to curb it but the slender rein of legislative discretion? The Chenango, from its source to its mouth, is nearly a hundred miles in length. If the legislature had extended the restriction over the whole, the question in all its legal relations would have been the same. This shows to what point the doctrine leads. A State is the guardian, not the broker of its people's rights; the protector, not the auctioneer of their property. It is invested with great and awful powers, and must necessarily be so; but among them all there is no power to oppress.*

The Dartmouth College case may perhaps be invoked against these views and in support of the pretensions of the other side. If it sustain such pretensions—grants of the State sovereignty from the control of successive legislatures forever—we deny its authority in this day.

But in truth there is no relation whatsoever between it and the case at bar. In the college case a royal charter had been granted to a number of persons, incorporating them as a religious and literary institution. Large donations were made to it. It had the power to fill vacancies in the board of its trustees, to manage its funds, &c. The legislature largely increased the number of trustees, and provided a different mode for the appointment of persons to have charge of the trust funds, &c. The court found no difficulty in holding that a contract had been made and its obligations violated. But suppose that the charter had said " it shall not be lawful to erect any other college in New Hampshire," would such an enactment—in injury of education and of public right *forever*—have been held binding?

If the provident principles of government which we have asserted be questioned, the principle of law will not be ques-

---

* See this matter strongly put by counsel, *arguendo*, in *Bridge Proprietors* v. *Hoboken Co.*, 1 Wallace, 131.—REP.

tioned, that all statutes which seek to abridge the power of legislation, to prohibit the exercise of common-law right and oppress the people, which confer monopolies or impose restraints or penalties, are to be construed strictly against those asserting the exclusive right and favorably for the public. The rule is one that has been imbedded from early days in the English law.*   It has been declared with force, by Sir William Scott† and by Lord Tenterden,‡ as existing equally in these.

Now " it would present," as Taney, C. J., said, in a well-known case,§ " a singular spectacle, if while the courts of England are restraining within the strictest limits the spirit of monopoly, and exclusive privileges in the nature of monopolies, and confining corporations to privileges plainly given them in their charter, the courts in this country should be found enlarging these privileges by implication, and construing a statute more unfavorably to the public and to the rights of the community than would be done in an English court of justice."   There, after premising that those who accept charters have full opportunity to examine and consider the provisions before they invest their money, he adds : " And if individuals choose to accept a charter in which the words are susceptible of different meanings; or might have been considered by the representatives of the State *as words of legislation only*, and subject to future revision and repeal, and not as words of contract; the parties who accept it have no just right to call upon this court to exercise its high power over a State upon doubtful or ambiguous words, nor upon any supposed equitable construction or inferences based upon other provisions in its acts of incorporation."

In *Dartmouth College* v. *Woodward*,‖ Marshall, C. J., says : " On more than one occasion this court has declared, that in

---

* See authorities cited by counsel *arguendo*, in Bridge Proprietors *v.* Hoboken Co., 1 Wallace, 134.                                    † Ib.

‡ Stourbridge Canal Co. *v.* Wheeley, 2 Barnewall & Adolphus, 793.

§ The Charles River Bridge *v.* The Warren Bridge, 11 Peters, 544.

‖ 4 Wheaton, 625.

no doubtful case would it pronounce a legislative act contrary to the Constitution."

In a great Pennsylvania case,* Black, C. J., says: "When the State means to clothe a corporate body with a portion of her sovereignty, and to disarm herself to that extent of the power that belongs to her, it is so easy to say so, that we will never believe it to be meant when it is not said. In the construction of a charter, to be in doubt is to be resolved, and every resolution which springs from doubt is against the corporation. If the usefulness of the company would be increased by extending privileges, let the legislature see to it, but remember that nothing but plain English words will do it."

Now, considering this question by the light of these general principles of government, or even by the general principles of the more restricted science of municipal law, has there been a perpetual exclusion of right, even as against individuals, to build?

The view taken by the Chenango Bridge Company is set out (*supra*, p. 57). It need not be here repeated. But we deny that the "exclusive right," whatever it may have been, in the Delaware charter, could have been extended to the Chenango bridge by any phraseology, such as the claim here rests on.

It will be observed (*supra*, pp. 52–3), that in incorporating the *Delaware* company, the act of 1805 sets forth the grant of the usual corporate powers specifically. These themselves—continual succession, suing, &c., are, we submit, "powers, rights, privileges, immunities, and advantages." But the act gives to the Delaware company not only these "powers, rights, privileges, and immunities," usually incident to corporations, but it gives, also, a right to purchase, hold, and *convey real estate;* not an incidental right to the creation of a corporation as such; and, over and above this, a power to the directors *to increase the stock indefinitely,* and to enforce payments for new stock by forfeiting old. When the *Susque-*

---

* Pennsylvania Railroad Company *v.* Canal Commissioners, 21 Pennsylvania State, 22.

*hanna* company comes to be incorporated by a subsequent section, the act does not proceed again *in extenso*, and give to it all these things; but says that the new company is invested with the powers, privileges, immunities, and advantages, &c., of the former company. This, of itself, we presume, would be conceded to be insufficient to give the exclusive privilege of the two miles; for the expression can be fed by the already mentioned ordinary and extraordinary powers given to the Delaware company. The right set up must rest upon the fact that the "provisions, *sections*, and *clauses*, not inconsistent," &c., contained in the incorporation of the Delaware company in the act of 1805, are "extended" to the second one, the Susquehanna company, of that same act. Still we submit that the intention was but to invest the Susquehanna company with the powers, rights, and privileges pertaining to a bridge corporation, as such, and similar to those which had just been given to the Delaware company; subjecting it to like duties, regulations, and restraints. All the provisions of the act in respect to the Delaware Bridge Company which related to its corporate powers; the manner of organization; the kind of bridge to be erected, and when to be completed; the right to erect gates at either end of the bridges, and demand and receive tolls; the neglect to repair or rebuild, which was to work a forfeiture of the charter; the duties enjoined in respect to the care and superintendence of the bridges, and the penalties imposed and to be enforced, were made applicable to the Susquehanna Bridge Company, and the section incorporating *it* should read as though these provisions were literally embodied in it also. The expression, too, "are fully *extended* to it," is peculiar. The provisions, clauses, &c., of the first company's charter are not declared to be made part of the second company's also (which it is here contended that by the expression used they were made); but are only "extended" *to* it. Is it not plain that language was used in the act—drawn, we may assume with certainty, by the agents of the corporations—which did not express in a clear manner that that was granted which it is now pretended was granted?

But this clause about the two miles, the prohibitory clause, in the Delaware charter, expressly includes the east and west branches of the Delaware; *two* branches, therefore. The Chenango River is but a single stream, and this clause, therefore, must be regarded as "inconsistent and inapplicable" to *it.* This clause was inapplicable in another respect. The Chenango River extended but about one hundred rods below the point where the plaintiffs contemplated erecting, and where they did actually erect their bridge.. The grant, therefore, as construed by the Chenango company, assumes that the river was of one kind, when it was in fact of another, bifurcated when it was single; and assumes, also, as a fact, that which was neither a fact nor a physical possibility, while the rivers ran together as nature made them do.

Conceding, however, that, under the act of 1805, the restrictive clause did apply for thirty years; we deny that it ever applied at all to the new Chenango Bridge Company, under the act of 1808. Under this last act, the former Susquehanna Bridge Company is divided into two companies; one, with the old name, to build a bridge across the Susquehanna; another, with the name of the Chenango Bridge Company, to build a bridge across the Chenango. Let us con-column the language of the old and new charters, as respects the Susquehanna company.

UNDER THE OLD CHARTER, 1805.

The Susquehanna Bridge Company is hereby invested " with all and singular the *powers, rights, privileges, immunities,* and *advantages,* . . . which are contained in the foregoing incorporation of the Delaware Bridge Company; and all and singular the PROVISIONS, sections, and clauses thereof not inconsistent with the particular provisions herein contained, shall be and hereby are fully extended to the president and directors of this corporation."

UNDER THE NEW CHARTER, 1808.

The incorporation of the Susquehanna Bridge Company shall hereafter be deemed and considered to exist for the sole purpose of erecting and maintaining a toll-bridge, under their said charter, across the *Susquehanna* River, at Oquaga, under all its present PROVISIONS, *except the limitation of its duration of thirty years, which said limitation shall. be and hereby is repealed.*

Not a word in the new charter about either "powers, rights, privileges, immunities, or advantages." The new

company exists under the old "provisions" only. Even the terms " sections and clauses" are omitted. In existing with this word " provisions," it exists with the same word which in the former charter was coupled with the words, "powers, rights, privileges, immunities, and advantages;" as also with the words, " sections and clauses;" and which in that former act, of course, were used to express something more and other than is expressed by the term "provisions." When we come to the section under which the Chenango Bridge Company is incorporated, it is worse for the complainants' cause even than this. Again let us con-column:

SUSQUEHANNA BRIDGE COMPANY, 1808.

"The incorporation of the Susquehanna Bridge Company shall hereafter be deemed to exist for the sole purpose of erecting and maintaining a toll-bridge, under their said charter, across the Susquehanna River, at Oquaga, under all its present *provisions*, except the limitation of its duration of thirty years."

CHENANGO BRIDGE COMPANY, 1808.

The present stockholders, &c., or such others, &c., "are created a body corporate, by the name of the Chenango Bridge Company, and as such have perpetual succession, under all the provisions, *regulations, restrictions*, clauses, and provisions of the before mentioned Susquehanna Bridge Company."

Everything like the valuable old " powers, rights, privileges, immunities, and ADVANTAGES" gone! clean gone! "Regulations," restrictions, clauses (or restrict*ing* clauses?), and provisions have assumed their place; and the term " provisions," to which these restrictive expressions are added, remains the forlorn hope of a monopoly. Now, though the word " provision" is sometimes used as synonymous with enactment, it is not philologically so used well. In its true meaning it expresses restriction. It comes from *pro*, before, and *video*, to see; and implies foresight; prudence with respect to futurity; a sense inconsistent with granting away *forever* the right of a whole people to cross a stream running through one of the best and most populous parts of a great State, and to the increase in population of which no limits could be fixed; a sense equally inconsistent with that of its consociated terms—" regulations, restrictions, clauses (or restrict*ing* clauses and provisions?)," its

companions in phraseology; *companions*, by whom words as well as people are often best known.

We insist, too, that the Chenango company was modelled after the *then existing Susquehanna company*—the Susquehanna company of the act of 1805—and not after it as the *bill pending proposed to make it*. The " regulations, restrictions," &c., of the Susquehanna company, under which the Chenango company was incorporated, were thus the legal, existing regulations and restrictions upon the statute-book, *including the thirty years' limitation*. The expression, "before mentioned Susquehanna company," used in the act of 1808, and subject to whose provisions, regulations, &c., the new Chenango company was incorporated, does not mean the Susquehanna company as the proposed act designed to make it. That might be true, if there had never yet been any such company as the Susquehanna company; but it would be true only because the expression could not otherwise be satisfied. But here there was already existing a completely organized and well-known company of that name, subject to provisions, regulations, &c., *in esse* and *defined*. Thus construed, the act of 1808, as to these charters, would read as follows: " The Chenango company shall be made as the Susquehanna company now is by law. The thirty years' limitation, now on the charter of the Susquehanna, is hereby repealed."

If this is so, instead of having a monopoly, the Chenango bridge has for the last twenty years been the property of the people of New York; has for all that time been imposing its exactions upon travel by usurpation; and its corporators now, instead of seeking to prevent and destroy other facilities for transit, demanded by public convenience, and to levy contributions upon wayfarers through all time, should be answering a *quo warranto*, filed by the attorney-general, and refunding to the people the tolls its corporators have collected without right.

It must be remembered that the legislative provision which the Chenango company set up as a " contract," was originally placed in the Delaware charter, when its duration was limited, in a separate section, to *thirty years;* that the

Susquehanna charter was borrowed from the Delaware charter, *the thirty years' limitation included;* that, as contended by the complainant in error, by a single stroke of subsequent legislation, the Chenango charter was spoken into its present existence; that both the Susquehanna and Chenango charters, in this same bill, gained separate and independent being; that they severally retained the exclusive right of the Delaware charter for "two miles above and below" their bridges to be constructed respectively, &c., and that both and each *escaped from the limitation* together, and gained an eternity of existence and an endless contract!

Does any one believe that any such thing was understood by the legislature? Does not this importation and reimportation of legislative enactment, so strangely carried out to make a contract, have the aspect of contrivance to obtain a contract without the legislature being aware that one was given? Why are the plain words of the earlier act— "powers, rights, privileges, immunities and advantages"— departed from, and the whole attempted to be got in under the term "provisions," &c.? Has there been any want of clear and round dealing on the part of the Chenango company? If the contract set up has been made by what Rogers, J., in the Pennsylvania case of *Lambertson* v. *Hogan*,* called "the covert design of the draughtsman," the observations of that judge in that case may be referred to for the weight that is due to the enactment. Certainly, at least, this legislative phraseology, called a contract, coming down to the Chenango charter under such circumstances—such a multiplicity of provisions, mixed up with near half a dozen corporations, some coming, some going—such a confusion of legislative tongues—such a jargon of tangled phrases—present reasons why the language set up as a contract should, in its application to the Chenango charter, and in its meaning, if placed there, be read with more than ordinary care, and be construed according to the strictest rules relating to legislative contracts and perpetual monopolies.

* 2 Pennsylvania State, 24.

Supposing, however, that the phrase, " it shall not be lawful," &c., does apply to the Chenango bridge, does it make a contract? Is it not mere legislative enactment, subject to repeal like any other statute? It has neither consideration, nor mutuality, nor form, nor substance, nor any other element of a contract. The words, indeed, are as common in legislation as the words " be it enacted" and " be it further enacted." The phrase " it shall be lawful," or " it shall and may be lawful," and " it shall not be lawful," may be found upon almost every page of our statute and session laws, commencing with our colonial legislature and coming down to the last session. The former phrase runs through the entire act now under consideration. One is employed to grant liberty to *any person* or *persons*, and the other to restrain them. So these phrases are employed and understood. The State by the expression used but incorporates the petitioners with certain rights, and authorizes them to erect and maintain a bridge and collect tolls, and volunteers a provision that competition within two miles shall not be lawful. The corporators neither pay, nor agree to pay anything; they neither do nor agree to do anything in consideration of the charter. They may erect a bridge or not erect it; when erected they may maintain it or not maintain it; if destroyed by decay or casualty, they may re-erect or not re-erect as they choose; in short, the corporators are not bound to do anything. They were not bound to erect it originally, and may now abandon it any day, and at their own convenience or caprice, regardless of the public interests or wishes. Should it be carried away by flood or destroyed by fire or become wasted by decay and be suffered to remain, what adequate remedy would the people of the State have upon their side of the " contract?" and what would be the *form of action?*

III. But conceding that it was "*not* lawful for any *person* or *persons*," of their own right or by authorization from the county boards or courts to erect a bridge over this stream within two miles of the complainants' bridge above or below

that of the complainants', does the legislature bind and prohibit *itself* from erecting a bridge, both directly and by delegation through charter to others?

The Chenango, as is matter of common knowledge, is a fresh-water stream, where the tide does not ebb and flow,—not navigable except for arks and rafts in freshets, and was to all intents and purposes a *private river*, subject to the public easement as a highway. The riparian proprietors might establish bridges or ferries at such points as they pleased, unless restrained by legislation; and, the statutes of New York, as early as 1797, had authorized the construction of highways and bridges by *superintendents and commissioners;* had forbidden the use of ferries for hire, unless duly authorized, and had given *courts of common pleas* power to license them at such points as they might think proper. The provision of the 31st section, in the charter, declaring that it should not be lawful for any person or persons to erect any bridge or establish any ferry within two miles of the bridge, &c., applied to the superintendents and commissioners of highways, and to the courts of common pleas, and to private persons. And that this is so is shown by the *proviso* to the 31st section, excepting *persons residing within two miles* of the said bridges and crossing to or from their own land in their own boats. There were thus sufficient persons and officers and public authorities to satisfy fully the restriction clause in the section without extending its operation to the State or to the legislative authority. For without the provision, the superintendent of highways for the county, and the commissioners of highways of the town and towns contiguous to the Chenango River, might have laid out highways and constructed bridges across the river at such places as they deemed proper; and the court of common pleas might have allowed ferries to be established across the same, so as entirely to destroy the plaintiffs' franchise.

That such enactments as this one—there being no exclusion of the power of the legislature—operate to exclude *individuals and corporations* only,—that they do not prohibit the legislature from the exercise of *its* sovereign authority in

granting further facilities when required by public necessities, and that the enactment may be repealed and modified at the pleasure of the legislature, has been adjudged in numerous cases in New York. We present one, *Thompson* v. *New York and Harlem Railroad Co.*,* decided by one of the best equity lawyers in New York. In that case the plaintiff's charter contained a clause like that of the Chenango bridge charter, declaring that " it shall not be lawful for any person or persons *whatsoever* to erect or cause to be erected," &c. The defendants erected a bridge under a subsequent act of the legislature within the prescribed limits, and upon bill filed for relief, Vice-Chancellor Sandford, upon a review of all the cases held, that the act of giving the plaintiffs charter " did not declare that the *legislature* would not permit the erection of another bridge," &c., and that it might lawfully grant the new charter. Other cases are to the same point.†

Cases may, no doubt, be found in this and other States, where it has been held, that when the legislature had made a contract in terms *excluding itself from authorizing* a rival work within defined limits, that a law authorizing such rival work within prescribed limits would be unconstitutional, and that the privileged corporation could have relief against it in equity. Such was *The Boston & Salem Railroad* v. *The Salem & Lowell Railroad*.‡ The legislature, as Shaw, C. J., declares, there put in plain terms a restraint on itself.

But not one case of respectable authority can be found, which holds that a legislative contract, disposing of a State's sovereignty, can be recognized by implication from a series

---

* 3 Sandford's Ch. 625.

† See Mohawk Bridge Co. v. The Utica and Schenectady Railroad, 6 Paige, 554; Lansing v. Smith, 4 Wendell, 9; Oswego Falls Bridge v. Fish, 1 Barbour's Chancery, 547; all in point. On the general subject, see Charles River Bridge v. Warren Bridge, 11 Peters, 544; East Hartford v. Hartford Bridge Co., 10 Howard, 511; West River Bridge Co. v. Dix, 6 Id. 529; Tuckahoe Canal v. James River, 11 Leigh, 42; Gould v. Hudson River Railroad, 2 Selden, 522.

‡ 2 Gray, 9.

of tangled phrases, doubtfully expressed, perhaps artfully contrived; or that mere every-day legislative phraseology constitutes a contract.

We have denied (*supra*, p. 59) that a contract to surrender the sovereignty of the State forever could, under any form be enacted by legislation that will bind for future time the State's representatives. To that view we hold. If, however, courts will but adhere to their own salutary prece dents, so often laid down—and from the facility with which great franchises are now obtained from our legislators by designing men, becoming every day more salutary—not to spell out of language, suitable and intended for mere legislative enactments, contracts which sap the foundation of common rights, fetter the State, and make her the servant of her own creation—the evil done by anything that is actually enacted will probably be small.

The complainants have no doubt suffered loss. But it is not every loss suffered that gives a remedy. There is a very ancient head of the law known as *damnum absque injuriâ;* and it is precisely that loss which these complainants have encountered.*

*Mr. Mygatt, contra.*

Mr. Justice DAVIS delivered the opinion of the court.†

The Constitution of the United States declares that no State shall pass any law impairing the obligation of contracts; and the 25th section of the Judiciary Act provides, that the final judgment or decree of the highest court of a State, in which a decision in a suit can be had, may be examined and reviewed in this court, if there was drawn in question in the suit the validity of a statute of the State, on the ground of its being repugnant to the Constitution of the United States, and the decision was in favor of its validity.

The plaintiffs in error brought a suit in equity in the Supreme Court in New York, alleging that they were

---

* Radcliff's Executors *v.* The Mayor of Brooklyn, 4 Comstock, 195
† Nelson, J., not sitting, being indisposed.

created a corporation by the legislature of that State, on the first of April, 1808, to erect and maintain a bridge across the Chenango River, at Binghamton, with perpetual succession, the right to take tolls, and a covenant that no other bridge should be built within a distance of two miles either way from their bridge; which was a grant in the nature of a contract that cannot be impaired. The complaint of the bill is, that notwithstanding the Chenango Bridge Company have faithfully kept their contract with the State, and maintained for a period of nearly fifty years a safe and suitable bridge for the accommodation of the public, the legislature of New York, on the fifth of April, 1855, in plain violation of the contract of the State with them, authorized the defendants to build a bridge across the Chenango River within the prescribed limits, and that the bridge is built and open for travel.

The bill seeks to obtain a perpetual injunction against the Binghamton Bridge Company, from using or allowing to be used the bridge thus built, on the sole ground that the statute of the State, which authorizes it, is repugnant to that provision of the Constitution of the United States which says that no State shall pass any law impairing the obligation of contracts. Such proceedings were had in the inferior courts of New York, that the case finally reached and was heard in the Court of Appeals, which is the highest court of law or equity of the State in which a decision of the suit could be had. And that court held that the act, by virtue of which the Binghamton bridge was built, was a valid act, and rendered a final decree dismissing the bill. Everything, therefore, concurs to bring into exercise the appellate power of this court over cases decided in a State court, and to support the writ of error, which seeks to re-examine and correct the final judgment of the Court of Appeals in New York.

The questions presented by this record are of importance, and have received deliberate consideration.

It is said that the revising power of this court over State adjudications is viewed with jealousy. If so, we say, in the words of Chief Justice Marshall, " that the course of the

judicial department is marked out by law.  As this court has never grasped at ungranted jurisdiction, so it never will, we trust, shrink from that which is conferred upon it."  The constitutional right of one legislature to grant corporate privileges and franchises, so as to bind and conclude a succeeding one, has been denied.  We have supposed, if anything was settled by an unbroken course of decisions in the Federal and State courts, it was, that an act of incorporation was a contract between the State and the stockholders.  All courts at this day are estopped from questioning the doctrine.  The security of property rests upon it, and every successful enterprise is undertaken, in the unshaken belief that it will never be forsaken.

A departure from it *now* would involve dangers to society that cannot be foreseen, would shock the sense of justice of the country, unhinge its business interests, and weaken, if not destroy, that respect which has always been felt for the judicial department of the Government.  An attempt even to reaffirm it, could only tend to lessen its force and obligation.  It received its ablest exposition in the case of *Dartmouth College* v. *Woodward*,* which case has ever since been considered a landmark by the profession, and no court has since disregarded the doctrine, that the charters of private corporations are contracts, protected from invasion by the Constitution of the United States.  And it has since so often received the solemn sanction of this court, that it would unnecessarily lengthen this opinion to refer to the cases, or even enumerate them.

The principle is supported by reason as well as authority. It was well remarked by the Chief Justice, in the Dartmouth College case, " that the objects for which a corporation is created are universally such as the Government wishes to promote.  They are deemed beneficial to the country, and this benefit constitutes the consideration, and in most cases the sole consideration for the grant."  The purposes to be attained are generally beyond the ability of individual enter-

---

* 4 Wheaton, 418.

prise, and can only be accomplished through the aid of associated wealth. This will not be risked unless privileges are given and securities furnished in an act of incorporation. The wants of the public are often so imperative, that a duty is imposed on Government to provide for them; and as experience has proved that a State should not directly attempt to do this, it is necessary to confer on others the faculty of doing what the sovereign power is unwilling to undertake. The legislature, therefore, says to public-spirited citizens: "If you will embark, with your time, money, and skill, in an enterprise which will accommodate the public necessities, we will grant to you, for a limited period, or in perpetuity, privileges that will justify the expenditure of your money, and the employment of your time and skill." Such a grant is a contract, with mutual considerations, and justice and good policy alike require that the protection of the law should be assured to it.

It is argued, as a reason why courts should not be rigid in enforcing the contracts made by States, that legislative bodies are often overreached by designing men, and dispose of franchises with great recklessness.

If the knowledge that a contract made by a State with individuals is equally protected from invasion as a contract made between natural persons, does not awaken watchfulness and care on the part of law-makers, it is difficult to perceive what would. The corrective to improvident legislation is not in the courts, but is to be found elsewhere.

A great deal of the argument at the bar was devoted to the consideration of the proper rule of construction to be adopted in the interpretation of legislative contracts. In this there is no difficulty. All contracts are to be construed to accomplish the intention of the parties; and in determining their different provisions, a liberal and fair construction will be given to the words, either singly or in connection with the subject-matter. It is not the duty of a court, by legal subtlety, to overthrow a contract, but rather to uphold it and give it effect; and no strained or artificial rule of construction is to be applied to any part of it. If there is no ambi-

guity, and the meaning of the parties can be clearly ascer-tained, effect is to be given to the instrument used, whether it is a legislative grant or not.  In the case of the Charles River bridge,* the rules of construction known to the English common law were adopted and applied in the interpretation of legislative grants, and the principle was recognized, that charters are to be construed most favorably to the State, and that in grants by the public nothing passes by implication.  This court has repeatedly since reasserted the same doctrine; and the decisions in the several States are nearly all the same way.  The principle is this: that all rights which are asserted against the State must be clearly defined, and not raised by inference or presumption; and if the charter is silent about a power, it does not exist.  If, on a fair reading of the instrument, reasonable doubts arise as to the proper interpretation to be given to it, those doubts are to be solved in favor of the State; and where it is susceptible of two meanings, the one restricting and the other extending the powers of the corporation, that construction is to be adopted which works the least harm to the State.  But if there is no ambiguity in the charter, and the powers conferred are plainly marked, and their limits can be readily ascertained, then it is the duty of the court to sustain and uphold it, and to carry out the true meaning and intention of the parties to it.  Any other rule of construction would defeat all legislative grants, and overthrow all other contracts.  What, then, are the rights of the parties to this controversy?

In 1805 the State of New York passed an act, in forty-two sections, creating five different corporations.  The main purpose of the act was, at that early day, to secure for the convenience of the public good turnpike roads; but the country was new; the undertaking hazardous; the roads crossed large and rapid streams, and the legislature, in its wisdom, thought proper to create two separate and distinct bridge incorporations, with larger powers than were conferred on the turnpike corporations.

---

* 11 Peters, 544.

The preamble to the 23d section declares the motives and purpose of the legislature. Heavy freshets and dangerous obstructions to which the streams were subject seemed likely to endanger the permanency of the bridges, and to require frequent renewals of the whole capital; and it was thought but just that the corporations for erecting the bridges should be relieved from the policy of reversion, which attached to the corporations for constructing the turnpike roads, and that full powers, adequate to the execution of the work in the best manner, should be assured to those citizens who would successfully accomplish the building of the bridges. It is impossible to read this recital, and escape the conclusion that the legislature thought the enterprise did not promise present remuneration, and that large powers and exclusive privileges must be given, to get the stock taken and the bridges built. It is evident that what was then considered a great scheme of internal improvement, was in the mind of the legislature. Such a scheme was, at that early period in the history of the State, not of easy solution. It required more energy and foresight, and involved greater hazard, in the commencement of this century, to build turnpike roads through an unbroken wilderness, and erect bridges over dangerous streams, than it would *now* to checker the surface of a State with railways. These considerations are great helps, in arriving at a correct knowledge of the intention of the legislature, and in giving a proper construction to the grants that were made. For it should never be lost sight of, that the main canon of interpretation of a contract, is to ascertain what the parties themselves meant and understood. In order to connect the turnpike roads, it was necessary to cross the east and west branches of the Delaware, the Susquehanna, and Chenango rivers. These streams were all in the same category. The work of improvement was incomplete until each was spanned with substantial bridges; and there is nothing to show that the dangers apprehended, and which formed the inducements to the grant of large powers, did not apply to all of them alike. Fifteen sections of the act are devoted

to the creation of the Delaware Bridge Company, for the purpose of erecting bridges over the east and west branches of the Delaware River, with the usual faculties, powers, and incidents of a corporation, and subject to the usual duties, regulations, restraints, and penalties.  The duration of the company was limited to thirty years, and competing bridges or ferries, within the prescribed limits of two miles above and below, were forbidden.  These were important privileges, and justified by the peculiar circumstances of the country; and it is easy to see that without them prudent men would not have engaged in the enterprise.  The Delaware Bridge Company having been constituted with great minuteness of detail, a few words and a single section sufficed to bring into existence the Susquehanna Bridge Company.  The thirty-eighth section of the act created the latter corporation, to erect and maintain toll-bridges across the Susquehanna and Chenango rivers, at certain localities; and further, declared that the "Susquehanna Bridge Company be, and hereby are, invested with all and singular the powers, rights, privileges, immunities, and advantages, and shall be subject to all the duties, regulations, restraints, and penalties which are contained in the foregoing incorporation of the Delaware Bridge Company; and all and singular the *provisions*, *sections*, and *clauses* thereof, not inconsistent with the particular provisions therein contained, shall be, and hereby are, fully extended to the president and directors of this corporation."

No one can read the entire act through, and fail to perceive that the legislature *intended* to create two bridge incorporations, exactly similar in all material respects.  Protection was alike necessary to both; the public wants required both; the scheme of improvement embraced both; the danger of present loss applied to both; and there were the same motives to give valuable franchises to both.

The inquiry, then, is, has the legislature used language that clearly conveys that intention? and on this point we entertain no doubt.

It is not questioned that the provision limiting the Dela-

ware charter to thirty years was carried into the Susquehanna charter; but it is denied that the prohibition against competition was also imported.

The clause in the Delaware charter on that subject is in the following words: "that it shall not be lawful for any person or persons to erect any bridge, or establish any ferry across the said west and east branches of the Delaware River, within two miles, either above or below the bridges, to be erected and maintained in pursuance of this act." This was, undoubtedly, a covenant with the Delaware company that they should be free from competition within the prescribed limits. It is argued, because the east and west branches of the Delaware are named, that the prohibition was not intended to reach the Susquehanna company. But this construction is narrow and technical, and would defeat the very end the legislature had in view. It is true there were certain minor provisions in the Delaware charter which were peculiar to it, and of course it would be absurd to suppose that they were transferred, or intended to be transferred to the Susquehanna company; but, by the terms of the law, whatever provisions were applicable, were extended to the latter company. It is easy to see that the legislature never meant that the judges of Delaware County, who were to visit and inspect the Delaware bridges, should also visit and inspect the Susquehanna, because there were similar officers in Tioga County, where the Susquehanna bridges were located. But the privilege against competition was applicable to both corporations, and, in the unsettled state of the country, necessary to the existence of both, for the legislature well knew, that it would be madness for adventurers to build toll-bridges in a new country, where travel was limited and settlers few, if the right was retained to authorize other adventurers to build other bridges, so near as to divide even that limited travel. The form adopted in making the grants has weight, in arriving at the true legislative intention, and it is worthy of consideration, that it is not unusual in the legislation of this country to grant vast powers in a short act, by referring to and adopting the provisions of other

corporations, of like purposes. In fact, some of the great enterprises of the day have sprung into existence and distributed their blessings by virtue of legislation similar to that which created the Susquehanna Bridge Company. The object is apparent, not to encumber the statute-book by useless repetition and unnecessary verbiage. The legislature of New York, at great length, and with commendable care and circumspection, incorporated the Delaware company, and then, to avoid repetition, gave to the Susquehanna company all the rights and advantages which, in the same act, were conferred on the Delaware corporation. *This was enough;* but in fear of cavil, and to avoid any misconstruction, and out of superabundant caution, it was declared that all the provisions, sections, and clauses in the Delaware charter, not *inconsistent* with the particular provisions of the Susquehanna charter, should be fully extended to the president and directors of the latter corporation. There were no inconsistencies between the two corporations, except such as would arise from difference in *locality*, and in every other respect the corporations were alike. Each was to bridge two streams, and each needed, and did receive the fostering care of the legislature. When it is conceded, as it must be, that a franchise which prohibits competition is an advantage, and that it was enjoyed by the Delaware company, and that there is nothing in the peculiar provisions of the Susquehanna charter which prevents that company from enjoying it, then it is conferred, and there is an end to controversy.

The history of the subsequent legislation of the State, on the subject of these bridges, is explanatory of the intention of the legislature of 1805, and confirmatory of the view already taken. In 1808, the Susquehanna and Chenango bridges were not built, and longer time and greater privileges were required to insure the success of that enterprise. The legislature, in fear that the scheme of internal improvement, which was not complete without the bridges, would fail, furnished still greater inducements to the parties proposing to erect them. The thirty years limitation was repealed, and the charter made perpetual, and the time limited

for building the bridges was extended four years. And these provisions of the Susquehanna charter, which were thus altered, and treated by the legislature of 1808 as belonging to it, were, if part of it, imported from the Delaware charter. Can it be supposed, when the Susquehanna company was demanding higher privileges in order to *live*, that it was the intention of the legislature to deprive it of the right to shut out competition, with which the Delaware company was invested, and which was nearly as valuable as the right to take tolls?

The intention of the legislature was manifest to confer on the Susquehanna corporation all the advantages enjoyed by the Delaware company that were applicable to it, and consistent with the different locality it occupied; and the language used, in our opinion, gives effect to that intention; and the two-mile restriction is as much a part of the charter of the Susquehanna company, as if it had been directly inserted in it. It is argued that the restriction cannot apply to the Chenango bridge, because it is located less than two miles from the confluence of the Chenango River with the Susquehanna. But the restriction is for two miles, either above or below the bridges, and is applicable to a bridge built above and within the prohibitory limits, although a question might arise, whether it was extended to a bridge which was built below the junction of the streams. The Susquehanna company, by the original charter, was to erect bridges over both the Susquehanna and Chenango rivers; but, with the amendments which were made in 1808, it was declared to exist for the sole purpose of building and maintaining a bridge over the Susquehanna, while at the same time the privilege of bridging the Chenango was given to "The Chenango Bridge Company," a new corporation, created with the same faculties and franchises, and subject to the same duties and restrictions as the Susquehanna corporation.

The construction which has been given by us to the Susquehanna charter is necessarily a solution of all questions pertaining to the charter of the Chenango Bridge

Company.   The legislature, therefore, contracted with this company, if they would build and maintain a safe and suitable bridge across the Chenango River, at Chenango Point, for the accommodation of the public, they should have, in consideration for it, a perpetual charter, the right to take certain specified tolls, and that it should not be lawful for any person or persons to erect any bridge, or establish any ferry, within a distance of two miles, on the Chenango River, either above or below their bridge.

Has the legislature of 1855 broken the contract, which the legislatures of 1805 and 1808 made with the plaintiffs?

The foregoing discussion affords an easy answer to this question.   The legislature has the power to license ferries and bridges, and so to regulate them, that no rival ferries or bridges can be established within certain fixed distances. No individual without a license can build a bridge or establish a ferry for general travel, for "it is a well-settled principle of common law that no man may set up a ferry for all passengers, without prescription time out of mind, or a charter from the king.   He may make a ferry for his own use, or the use of his family, but not for the common use of all the king's subjects passing that way, because it doth in consequence tend to a common charge, and is become a thing of public interest and use; and every ferry ought to be under a public regulation."*   As there was no necessity of laying a restraint on unauthorized persons, it is clear that such a restraint was not within the meaning of the legislature.   The restraint was on the legislature itself.   The plain reading of the provision, "that it shall not be lawful for any person or persons to erect a bridge within a distance of two miles," is, that the legislature *will not make it lawful* by licensing any person, or association of persons, to do it.   And the obligation includes a free bridge as well as a toll bridge, for the security would be worthless to the corporation if the right by implication was reserved, to authorize the erection

* Hargrave's Law Tracts, ch. ii, 16; The Enfield Toll Bridge Co. v. The Hartford and New Haven Railroad Co., 17 Connecticut, 63; Hooker v. Cummings, 20 Johnson, 100; Bowman v. Wathan, 2 McLean, 383.

of a bridge which should be free to the public.    The Bing-hamton Bridge Company was chartered to construct a bridge for general road travel, like the Chenango bridge, and near to it, and within the prohibited distance.    This was a plain violation of the contract which the legislature made with the Chenango Bridge Company, and as such a contract is within the protection of the Constitution of the United States, it follows that the charter of the Binghamton Bridge Company is null and void.

DECREE of the Court of Appeals of New York reversed, and a mandate ordered to issue, with directions to enter a judgment for the plaintiff in error, the Chenango Bridge Company, in conformity with this opinion.

The CHIEF JUSTICE, and Justices FIELD and GRIER dissented.    The latter delivering an opinion, as follows:

I feel unable to concur in the opinion of the majority of my brethren, which has just been read.    The general prin-ciples of law, as connected with the question involved in the case, are, no doubt, correctly stated, as to the strict con-struction of statutes as against corporations claiming rights so injurious to the public.    My objection is, that they have not been properly applied to the case before us.

The power of one legislature to bind themselves and their posterity, and all future legislatures, from authorizing a bridge absolutely required for public use, might well be de-nied by the courts of New York; and as a construction of their own constitution, we would have no right to sit in error upon their judgment.    But assuming a power for one legislature to restrain the power of future legislatures, those who assert that it has been exercised should prove their as-sertion beyond a doubt.    Such intention must be clearly expressed in the letter of the statute, and not left to be dis-covered by astute construction and inferences.    Although an act of incorporation may be called a contract, the rules of construction applied to it are admitted to be the reverse of these applied to other contracts.    Yet the opinion of the

court, while admitting the rule of construction, proceeds on a contrary hypothesis, and with great ingenuity, and astute reasoning, has given a construction most favorable to the monopolist, and injurious to the people.

The judgment given by the majority of my brethren regards the general language of the act of incorporation as first bringing to the *Susquehanna* company a provision that "it shall not be lawful for any person or persons to erect any bridge," &c., across the *east and west* branches of the *Delaware:* as then bringing this specific clause into the charter of the Chenango company, and applying it to the *Chenango* River (a river with but a *single* stream); making it, moreover, apply to that stream for two miles, indeed, above the bridge, but for three-quarters of a mile only below it, the river's entire extent in that direction, and finding the complement of the "two miles," in a mile and a quarter of the river Susquehanna, into which the Chenango falls and is lost. While withal, by like construction only, the original limitation of thirty years disappears, and the charter becomes perpetual.

This mode of interpreting a legislative grant appears to me irrational, and beyond the most liberal construction that has been given to that class of enactments. Indeed, the fact that it required so ingenious and labored an argument by my learned brother to vindicate such a construction of the act seems to me, of itself, conclusive evidence that the construction should not be given to it.

[See *infra*, p. 210, *Turnpike Co.* v. *The State.*—REP.]

