Staunton.

SNIDOW AND OTHERS V. BOARD OF SUPERVISORS OF GILES
COUNTY AND ANOTHER.

September 19, 1918.

1. FERRIES—*Eminent Domain—Taking Franchise Without Compensation.*—A ferry franchise granted by legislative authority exercised by a circuit court is a private property right—an incorporeal heriditament. And to the extent of the right granted by such franchise, such property right is undoubtedly protected by section 58 of article 4 of the Constitution of Virginia of 1902, which provides that the legislature "* * * shall not enact any law whereby private property shall be taken or damaged for public use without just compensation."

2. FRANCHISE—*How Far Exclusive—Right of Sovereign.*—A franchise may be granted as exclusive as against some persons and not as against others. That is to say, a franchise may be, and most often is, granted as exclusive as against all persons other than the sovereign granting it, but not as exclusive in the sense that the sovereign may not itself subsequently exercise or grant to another the right to exercise the same or a similar franchise so near the same locality occupied by that first granted as to interfere with and perhaps wholly to destroy the income enjoyed by the latter from such prior franchise and the investment of capital therein. Consequently, there is a most important and fundamental difference between the rights of holders of franchises in controversies with rival operations, where the latter are not authorized by legislative authority, from the cases where the rival operations are so authorized.

3. FERRIES—*Franchise—Exclusiveness—Bridge Erected Near by Without Legislative Authority.*—In a controversy between the owner of a ferry, which is exclusive as against all others not acting under legislative authority and is derived by legislative grant, and a person or corporation, not acting under legislative grant, purporting to authorize such action without liability for damages, where a bridge across the same stream is erected and operated by the latter so near to the ferry as to draw away its custom, this will be held to be an infringement of the ferry franchise, although the approaches and operation of the ferry

may not be physically obstructed thereby; and such owner or operator of the bridge will be liable in damages to the owner of the ferry for drawing away the custom of the latter.

4. FERRIES—*Exclusiveness—Eminent Domain—Taking Private Property Without Just Compensation.*—If a ferry or bridge is established under a franchise granted by legislative authority as exclusive against the sovereign State, the location and operation by legislative authority of a later rival ferry or bridge so near to the first established as to draw away the travel from it, amounts to a *taking* of the property right in the first ferry, within the constitutional inhibition against the taking of private property for public use without just compensation.

5. FERRIES—*Franchise—Impairment of Obligation of Contracts.*— An express grant of an exclusive franchise as against the sovereign State is a contract between the grantee and the State and any subsequent act of the legislature of the State impairing its obligation is void under the federal Constitution.

6. FERRIES — *Franchise — Exclusiveness — Construction of Grant.*— Whether the grant of a franchise (such as that under consideration, to-wit, of a ferry) is exclusive as against the sovereign State, is to be determined by the construction of the grant itself. And the grant will be strictly construed against the grantee and in favor of the sovereign; and such a grant will not be deemed exclusive unless expressly so stated in the grant itself or such conclusion arises by necessary implication from the express language of the grant.

7. FERRIES — *Franchise — Exclusiveness — Construction of Grant— Right of Legislature to Establish Rival Ferry.*—A grant of a ferry franchise by an act of the legislature, or by a court acting under legislative authority, merely giving the authority to establish and operate a ferry, does not confer an exclusive right, so as to deprive the legislature of power to subsequently authorize another ferry or bridge near the same place (it not being in the same location), without infringing upon the prior grant. And the fact, at the time of the grant of the ferry franchise, there was a general statute (section 1386 of the Code of 1904) in existence, providing that no *court* should grant leave to establish a ferry within half a mile of another ferry legally established, does not change the rule of construction.

8. BRIDGES—*Establishment—Special Road Law of Giles County— Acts 1908, page 611; Code of 1904, section 944-a.*—The special road law for Giles county (Acts 1908, page 611) does not expressly repeal section 944-a, Code of 1904, so far as applicable to the taking of initial action for the establishment and location of new bridges in Giles county by the board of supervisors; nor does it do so by necessary implication; such action of the

board of supervisors not undertaking or purporting to extend to the condemnation of land for use for the location of the bridge, or for its approaches, jurisdiction over which matters is conferred on boards of supervisors by said section 944-a as the general law of the State. The latter jurisdiction was taken away from the board of supervisors of Giles county and conferred on the road commission.

9. BRIDGES—*Establishment—Special Road Law of Giles County—Acts 1908, page 611; Code of 1904, section 944-a.*—Under the special road law of Giles county (Acts 1908, page 611) and the general statute law of the State as to roads and bridges, the initial determination that a bridge should be established and its location, the determination of the plans and specifications for the bridge and its approaches, the erection of the bridge and its approaches, are left under the jurisdiction of the board of supervisors, subject to the limitation that the erection or supervision of the work of the erection of the bridge and its approaches, must be under the road commissioner, or commissioners, in whose district the work is located, whereas the location of the approaches as they recede from the bridge, the acquisition or condemnation of the right of way for the bridge and its approaches, are transferred to the jurisdiction of the road commission.

10. FERRIES—*Exclusive Franchise—Establishment of Bridge—Case at Bar.*—In the case at bar, since the board of supervisors and road commission acted under legislative authority, authorizing, and, as to the former, also validating, their action in locating and establishing the bridge, together with its approaches, in question, such bridge (with its approaches), in so far as they do not physically obstruct the approaches to the ferry of appellants, did not infringe upon the property rights of appellants in said ferry, and hence will not, by its drawing away the custom in public travel from such ferry, even though it result in the total withdrawal of such custom therefrom, *take,* or *damage,* the property of appellants within the meaning of section 58 of the Constitution of 1902. And in the instant case there was no evidence tending to show that either of the approaches to the landings of the ferry will be in any way obstructed by the bridge or its approaches. But should the actual construction of the approaches to the bridge physically obstruct the public road approaches to the ferry, the proceedings in the instant cause would furnish no bar against the owners of the ferry in further proceedings to assert their right.

11. STREETS AND HIGHWAYS—*Establishment of New Road—Special Road Law of Giles County.*—In the instant case, it was objected by appellants that the district board of road commis-

sioners for Pembroke district undertook to make certain changes in the road in question, which could be done only in conjunction with the district board of *Pembroke* (Pearisburg) district, as provided for by the road act of Giles county, since both districts would be affected by such change.

*Held:* That the provision relied on by appellants only applied where the application is for a new road or changing of an existing road, which is "in more than one district," and, therefore, had no application in the instant case, as the road in question was wholly in the Pembroke district.

12. STREETS AND HIGHWAYS—*Eminent Domain—Notice—Due Process of Law—Case at Bar.*—The special road law of Giles county constituted the road commission a court, with power of adjournment from time to time and from place to place, and conferred upon it the jurisdiction to disregard the route of the road proposed in the application therefor and to choose and establish a wholly different location therefor. Appellants having been duly summoned before the road commission at the time and place of their initial meeting were thereby duly made parties to all the subsequent proceedings of the road commission, including a change in the location of the road; were thus given their day in court; and were bound by such proceedings, under the provisions of such special road law, except as they might be relieved therefrom upon appeal taken in accordance therewith. Thus were the appellants afforded due process of law, including a trial by jury as provided for in such statute.

Error to a judgment of the Circuit Court of Giles county. Judgment for defendants. Plaintiffs assign error.

*Affirmed.*

This is an appeal by the appellants, the land and ferry owners affected thereby, from a judgment of the Circuit Court for Giles county, entered in accordance with the verdict of a jury on the trial of an appeal to such circuit court by appellants from the action of the board of supervisors of Giles county (hereinafter designated "board of supervisors"), taking certain initial steps in locating and establishing, and in contracting for and proceeding with the erection of a new bridge across New river, near Pembroke

in said county, and from the action of the district board of road commissioners for Pembroke district of Giles county (hereinafter designated "road commissioners") in establishing a road for, and in its allowance of only twenty-five ($25.00) dollars damages to appellants (being for their land taken) by the location of a portion of the approach to the eastern end of said bridge, being the extreme eastern approach to such bridge from the existing public road.

At the time of the commencement of the proceedings, and of the judgment complained of, the appellants were the owners and operators of a public ferry across New river, near Pembroke in said county, the franchise for which was granted under the general statute law of the State of Virginia by order of the Circuit Court for Giles county on June 21, 1892, in the usual form for such an order. The landing of the ferry on the eastern side of the river was "at the point where the public road comes to the bank of said New river * * * on the lands of * * *" (the appellants), and the landing of the ferry on the western side of such river was on the land belonging at the time of the granting of the franchise aforesaid to the Mt. Lake Land Company, and, at the time of said proceedings and judgment, to the Norfolk and Western Railway Company.

There was no provision in the order of court granting said franchise which purported to give appellants such franchise in exclusion of the right of the Commonwealth to subsequently grant to others the authority to open and use for private or public benefit, another ferry or bridge across said river, in a location alongside of, or near by, the ferry of appellant.

The general statute law of the Commonwealth at the time of the granting of said ferry franchise to appellant contained (and, indeed, until the present time still contains) the following provision:

"That no court shall grant leave to establish over a water course a ferry within half a mile of any other ferry legally established over the same water course." (See Pollard's Code of Virginia, section 1386.)

The board of supervisors in the instant case rely upon section 944a of the Code of Virginia, and the special act of the legislature (Acts of Assembly, 1916, page 548), and the road commission upon the special road law for Giles county, contained in Acts of Assembly, 1908, page 611, as giving them, respectively, legislative authority for their action which is complained of by appellants.

Said section 944a, so far as material, is as follows:

"Section 944a. *Establishment* \* \* \* *of* \* \* \* *for building* \* \* \* of all \* \* \* public bridges \* \* \*."

"(2) Whenever \* \* \* any person applies to the board" (of supervisors) "to have a road \* \* \* therein established \* \* \* it may appoint five viewers, \* \* \* any three of whom may act, to examine such roads or routes, and report upon the expediency \* \* \* of establishing any new road, or building \* \* \* any bridge \* \* \*."

Subsection (3) of such statute provides for the report of the viewers, specifying certain specific matters required to be reported upon, among which are "the names of the land owners" on the route in favor of which their report may be made; "which of such land owners require compensation" for the land to be "taken and for damages to the residue of the tract, beyond the peculiar benefit to be derived in respect to such residue from the road \* \* \* to be established;" and "all other facts and circumstances in their opinion useful in enabling the board of supervisors to determine the expediency of establishing \* \* \* the *road* \* \* \* and they shall forthwith file their report with the clerk of the board."

Subsections (4) and (5) of such statute provides for fur-

ther proceedings, where same are taken under such general road law, for summons of the land owners affected, giving them a day before the board of supervisors to make defense against the establishment of the road (which also involves the right of defense against the establishment of a *bridge*), and in the matter of the damages proposed to be allowed to them by such board in case the board be of opinion that the *road* (which covers also a bridge) should be established.

Under such statute the board of supervisors in the instant case, by order entered October 5, 1915, on the application of certain citizens of Giles county "for the location and establishment of a wagon bridge across New river at Pembroke" appointed five viewers (John F. Williams and others), any three of whom might act, "to meet at the proposed location for said bridge and examine the same and other localities in that vicinity and report in favor of the one they prefer, with their reasons for the preference" and further directed specifically the report required by the last named statute. Four of the viewers thus appointed acted on October 22, 1915, and filed their report in writing to the board of supervisors promptly with the clerk of the board, in which they reported in favor of the location of the proposed bridge so that the eastern end of it would be located about 272 feet down the river (in a northerly direction) from the ferry landing of appellants on the eastern side of said river (the bridge and its approaches on that side of the river to be located, not on, but below the land of appellants, upon the land of others) ; and the western end of the bridge to be located about 154 feet down the river from the ferry landing of appellants on the western side of said river, on the right of way of the Norfolk and Western Railway Company, by an overhead railway crossing; and accompanied their report with an offer in writing from said railway company to donate $7,000 towards the erection of the bridge provided it should cross its tracks overhead and "eliminate

the present grade crossing" going to the landing of the ferry of appellants on the western side of said river. The viewers submitted with their report "an estimate from the Virginia Bridge and Iron Company of Roanoke, Va., for the erection of such bridge, giving figures for the proposed bridge and also the overhead crossing desired by the Norfolk and Western Railway."

It appears from the record in the instant case that by resolution of the board of supervisors "entered of record on the eighth day of November, 1915" * * * the said report of said viewers "was approved and adopted."

It further appears from the record in the instant case that three of said viewers who made said report subsequently, to-wit, on November 27, 1915, united in a writing recommending to the board of supervisors "that the location of the eastern end of said bridge be so changed as to bring it to a point 195 feet below the said * * * ferry landing" (of appellant on the eastern side of said river) "for the reason that it can be more readily reached by a public road to that point."

Whereupon, by order of the board of supervisors entered on November 29, 1915, it was resolved "that the location of said bridge be so changed as to place the center thereof, on the eastern side of the river, at low water mark, at a point 195 feet below the present eastern landing of the * * * *" (appellants) "ferry, and on the land of * * * *" (appellants); "the approach thereto to extend back to the land of * * * *" (others than appellants) "so as to come into the present public road at a point in front of H. F. Snidow's house" and to make the location of the western end of the bridge about 100 feet below the ferry landing on the western side of the river. There was no provision in this order for the letting of the contract for the erection of said bridge, nor with respect to any overhead crossing of the Norfolk and Western Railway tracks on the western side of the

river, or for the elimination of the grade crossing of such tracks approaching the ferry landing of appellants on the western side of the river. And there is no evidence in the record that the elimination of the approach to the ferry landing aforesaid on the western side of the river was ever in fact decided upon.

Subsequently the special act of the legislature aforesaid (Acts 1916, page 548) was adopted and went into effect March 20, 1916, which so far as material, was as follows:

"1. Be it enacted by the General Assembly of Virginia, that the county of Giles be and it is hereby authorized to construct and maintain a public free highway bridge or bridges across New river at such a point or points in said county as may have been heretofore selected by commissioners appointed by the board of supervisors of said county for that purpose * * *."

Prior to the special act of Assembly last mentioned, however, to-wit, at some time between November 8 and 29, 1915, four citizens of said county (to-wit, John F. Williams and three others), made application in writing to said road commission as follows:

"To the Board of Road Commissioners for Pembroke District, in Giles county, Va.:

"Your undersigned petitioners, who are resident freeholders of the county of Giles, respectfully represent unto you that the board of supervisors of Giles county, by an order entered on its records on the 8th day of November, 1915, established the location of a wagon bridge across New river at Pembroke, the eastern end of which bridge will land about 275 to 300 feet below the ferry landing of" (the appellants—naming two of them) "and said board of supervisors is now ready to contract for the construction of said bridge.

"In order to reach the eastern end of said bridge and to

provide proper approach thereto and ground upon which to erect necessary piers therefor, it will be necessary to have a change of the public road.

"Your petitioners therefore pray that you go upon the ground and view the same and make and establish such change in the county road as may be necessary to secure a proper approach to said bridge and location for necessary piers and abutments upon which said bridge shall be erected, said change to begin at a point in the present public road about opposite the house of said Henley F. Snidow, thence in front of the store house of said Henley F. Snidow, thence to the river bank where the landing of said proposed bridge has been located as aforesaid and thence to the middle of New river on the line of said bridge.

"Said change of public road will probably pass through the land of" * * * (appellants and others, naming them).

"May proper summons issue and your report be made as the law directs."

(Signed)   "T. Gilbert Porterfield,<br>
"A. W. Lumsden,<br>
"John F. Williams,<br>
"F. F. Farrier,<br>
"By Counsel."

Following the latter application the road commission made the following report dated November 29, 1915, of their action on such application, namely:

"To Hon. Fulton Kegley, Judge of the Circuit Court of Giles county, Va.:

"In pursuance of a summons issued by the clerk of your honor's court on the petition of John F. Williams and others asking for the establishment of a road in the Pembroke district near the Snidow" (appellant's) "ferry on the eastern side of New river at Pembroke, Va., for the purpose of acquiring necessary ground on which to erect a wagon bridge

proposed to be erected across New river at that point, and for the necessary approach to said bridge, your undersigned, J. T. S. Hoge and C. B. Williams, who constitute the board of road commissioners for said Pembroke district, went on the ground, on Saturday, November 27, 1915, the day fixed in said summons, there being also then present * * *" (two of appellants and others—naming them) "land owners who had also been duly summoned; Mrs. Vira Snidow" (another of appellants) "having also been summoned not being present in person;

"After viewing the ground and considering the location of the proposed bridge, as fixed by John F. Williams and others, commissioners heretofore appointed for that purpose, and the character of the approach to said bridge, we were of opinion that it would be much better if the location of the eastern end of said bridge could be changed to a point 195 feet below the Snidow ferry landing instead of 272 feet below said landing as recommended by said bridge commissioners; and the undersigned J. T. S. Hoge, who is also chairman of the board of supervisors of Giles county, knowing that said board of supervisors were to have a meeting in the courthouse of Giles county on this day, we adjourned to meet here at the courthouse on this day and confer with the said board of supervisors with a view to having the location of said bridge changed; and

"Whereas, it being made known to us that the said board of supervisors now in session, and having before them three of said bridge commissioners, have entered an order and resolution which is concurred in by the bridge commissioners, changing the location of the eastern end of said bridge so as to locate the center thereof, at low water mark, on the eastern side of the river, at a point 195 feet below the present ferry landing of the Snidow ferry, and the approach thereto to extend back over the land of * * *" (appellants and others—naming them), "and come into the present public road in front of H. T. Snidow's store house.

"Now in consideration of all the foregoing and of all the facts and circumstances in connection therewith, we hereby establish a public road thirty feet in width, beginning at a point in front of H. F. Snidow's store house and running from there directly toward the river, passing through the southern end of said H. F. Snidow's lot and then about seventy-five feet through the land of * * *" (appellants) "to a point on the bank of the river at low water mark, the center of which is to be 195 feet below the present eastern landing of the Snidow ferry, and from thence on the line of said bridge as located by the order of the board of supervisors this day entered, to the center of New river.

*"It is expressly understood that the establishment of this road shall not be construed to discontinue the present road to the Snidow ferry landing but said road shall be left open so as not to interfere with the public travel to and from said ferry.*

"We have allowed * * *" (appellants) "jointly, the sum of $25.00 damages, on account of the location of said road through their lands, and to H. F. Snidow and wife $25.00.

"Given under our hands this 29th November, 1915." (Italics supplied.)

(Signed) · "J. T. S. Hoge,
"C. B. Williams."

The last named application was made and the action of the road commission appearing from the last named report was taken under the above mentioned special road law for Giles county (Acts 1908, page 611) which, so far as material, is as follows:

"That for the purpose of establishing, altering * * * the roads and bridges of Giles county * * there shall be and is hereby created for each magisterial district in said county, a board of road commissioners, to be composed

of the supervisors for the district and a road commissioner for that district." Then follow provisions for the election of the road commissioners and for their qualification and compensation. The act thereupon further provides: "That application for a new road or changing * * an existing road, must be upon written petition addressed to the district board of road commissioners in which such road is now or is asked to be located, in which a part thereof is, stating specifically the change, the *continuance*· (evidently a misprint for *discontinuance*), "or route of the new road from point to point, also stating the names of the land owners through whose lands the proposed new road or alteration extends, which shall be signed by petitioner or his counsel and forwarded to the clerk of the circuit court of Giles county, who shall forthwith issue a summons to the members of the road commission in whose district the proposed road, alteration or discontinuance is; and, *if in more than one district, then also to the members of the commission of any other district affected thereby*, to appear at a point on the proposed road, change, alteration or discontinuance to be named in the summons at the time named therein * * * and together they shall view said route for a new road, change or discontinuance, and hear such evidence relevant thereto as may be offered them, and cause said changes, new road or discontinuance to be made in accordance with said application; or, *if such commission, upon a view of such proposed route, is of opinion that a better location for such proposed new road or changes can be obtained* by reviewing another route, *then, in that event, the said commission may cause such change to be made*, or new road to be opened, and in their report give the reasons for the alteration made from the location specified in the petition, stating clearly and specially the change of route of the new road from point to point, *also stating the names of the land owners through whose lands the proposed new*

*road* or alteration *extends*, or report adversely according to their judgment. *They* or *either of them attending, may adjourn the proceedings from time to time and place to place* \* \*. The clerk of the said circuit court of Giles county will, at the time of the issuance of the summons to the members of the road commission, *issue a summons to the land-holders named in said petition to appear at the same time and place named in the summons to the road commission to show cause against the establishment, alteration* or discontinuance \* \*."

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

"4. Should said commission establish a road or make any change or alteration in the same, they shall assess the damages to the land owners and file in the clerk's office of the circuit court of Giles county a report of their action, with a full description of the road established, alteration or road discontinued, stating the width \* \* of the new road established and alterations made \* \* \* ; and said report made by said commission establishing a road or making any changes or alteration in an existing road shall be final, except as hereinafter provided; *but any land owner damaged* \* \* *shall have* the right to appeal to the circuit court, if the sum reported by the commission or commissioners is deemed by him or any of them insufficient \* \*. If any land owner damaged desires to appeal to the circuit court on the question of damages, he may, within thirty days after said report is filed in the clerk's office of the circuit court, apply to said circuit court, or to the judge thereof in vacation, for an appeal on said question of damages \* \* and the same shall be allowed by said court or judge and the cause be placed on the docket for trial at the next term of the circuit court \* \*.

"5. A trial of said appeal shall be by jury \* \* and without formal pleading, and *shall be final except to appeal as to points of law.*

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

"13. * * * The building * * of any bridge * * in said county shall be directed by the commissioner of the respective districts, after any bridge shall have been directed to be built *as now prescribed by law.*" (Italics supplied.)

The appellants in the circuit court demurred to and moved to quash the proceedings of the board of supervisors and road commission on the following grounds, viz.:

"(a). Because the record shows that the board of supervisors undertook to locate and build the road bridge under the general law of the State. This law (944a, clauses 4, 5 and 6) provides that before an order of a board shall become final and binding, the land owners affected thereby shall be cited to appear so that they may show cause, etc., against the establishment thereof, and so that the board sitting as a court may likewise hear and determine a just compensation for the land proposed to be taken and the damage accruing therefrom. Neither of these opportunities were afforded petitioners, and they submit that thereby they have been put to extra and great costs in attempting to have their cause heard and determined. This was a denial by the said authorities of your petitioners to have their day in court.

"(b). Because the district board of road commissioners for Pembroke district undertook to make certain changes in the road in question, which could be done only in conjunction with the district board of *Pembroke* (Pearisburg) district, as provided for by the road act of Giles county, since both districts would be affected by such change. It is respectfully submitted and urged that for this reason also the said demurrer and motion to quash should have been sustained."

Such demurrer and motion were overruled by the court below. This action of the trial court is assigned as error by the appellants.

Thereupon a trial by jury was had which resulted in the verdict of the jury aforesaid. Whereupon the appellants moved the court to set the verdict aside as (a) contrary to law, (b) because of the improper admission of evidence, (c) because of the exclusion of proper evidence and (d) because of misdirection of the jury; which motion the trial court also overruled and this action is also assigned as error by the appellants.

The testimony excluded by the court, referred to in said motion to set aside the verdict, was (so far as material to be mentioned) certain testimony offered by the appellants tending to show the capital they had invested in the ferry, the value of the ferry franchise and the consequent loss and damage the appellants would sustain by reason of the physical obstruction of the public road approach to the landing of their ferry on the eastern side of the river heretofore existing (which obstruction the appellants allege will result from the construction of the approach to said bridge at its eastern end) ; and the further consequent loss and damage the appellants will sustain by the diversion of travel from their ferry which will be caused by the location and establishment of the said bridge as a free bridge, open to the public, in such close proximity to their ferry.

The uncontroverted fact is that the bridge itself does not touch or affect either of the approaches to the ferry.

The testimony admitted by the court, referred to in said motion to set aside the verdict, was certain testimony introduced by the appellees to the effect that the only contract, for the construction of the abutments and approaches to the bridge, which had been in fact entered into at any time, was for the abutment and approach to it on the eastern end of the bridge, which was made by the board of supervisors with the Virginia Bridge and Iron Company, of Roanoke, Va., on June 7, 1916, and that such construction, as contracted for, and as in fact being made, would not result

in any physical obstruction of said public road approach to appellants' ferry landing on the eastern side of the river.

On the question whether the construction last above referred to would result in any physical obstruction of said approach to the landing of said ferry on the eastern side of the river, the appellants introduced evidence tending to show that if such construction was made in accordance with certain plans therefor, which were being considered by the board of supervisors at the time the condemnation proceedings aforesaid were instituted and prior to the time the damages aforesaid were assessed in favor of appellants by the road commission as aforesaid, such construction would have resulted in the physical obstruction of said public road approach to said eastern ferry landing. But there was no evidence introduced for appellants, or otherwise in the case, tending to show that such earlier plans were ever decided upon by the board of supervisors for the construction of the approaches to the bridge. And there was no evidence introduced for appellants, or otherwise in the case, tending to show that the construction of the approaches to the bridge as in fact decided upon and contracted for by the board of supervisors, would physically obstruct in any way the approaches to the ferry landings of the appellants, either on the eastern or western side of the river.

The instruction complained of, as aforesaid, which was given to the jury, was as follows:

"By the Court: Gentlemen of the jury: This case is to be submitted to you without argument upon the instructions of the court. You will not take into consideration any evidence relating to any damages to this ferry or to the ferry franchise or the ferry rights in any way. According to my theory all those matters have nothing to do with this case you are here to try. You are only to consider those things as damages referred to in this instruction. The

court instructs the jury that in assessing the damage in this case they shall ascertain from the evidence and say what will be a just compensation for the land taken and for the damage to the residue of the tract of land beyond the peculiar benefit to be derived in respect to such residue from the road and bridge established."

*R. W. Kime* and *H. M. Fox,* for the plaintiffs in error.

*Williams & Farrier* and *W. B. Snidow,* for the defendants in error.

SIMS, J., after making the foregoing statement, delivered the following opinion of the court:

The assignments of error raise the questions which will be considered and disposed of in their order as stated below.

1. It is settled by the authorities that the ferry of the appellants is a private property right—an incorporeal hereditament—acquired from the Commonwealth, granted by legislative authority exercised by the circuit court per its order of June 21, 1892, above referred to, which granted to appellants the franchise for such ferry. *Patrick* v. *Ruffin,* 2 Rob. (41 Va.) 209, 40 Am. Dec. 740; *Conway* v. *Taylor,* 1 Black, 603, 17 L. Ed. U. S. Supreme Ct. Rep. 191, 11 R. C. L., p. 926. And to the extent of the right granted by such franchise, such property right is undoubtedly protected by sec. 58 of Art. 4 of the Constitution of Virginia of 1902, which provides that the legislature " * * shall not enact any law whereby private property shall be taken or damaged for public use without just compensation." *Mason* v. *Harper's Ferry Bridge Co.,* 17 W. Va. 396; 4 R. C. L., p. 199; Lewis on Em. Dom. (2nd ed.) sec. 228, and note thereto.

But the question remains: What is the extent of the

property right granted? When is it infringed upon? How exclusive is it?

There is a distinction drawn by many of the authorities in England and in the United States between a franchise for a ferry and a franchise for a bridge; some holding that the operation of the one does not infringe upon a franchise for the other. In view of the conclusions hereinafter stated, it will be unnecessary for us to enter upon any consideration of that distinction. For the purposes of this case we may assume that the operation of a rival bridge will as much infringe upon a nearby ferry previously established, as would be a rival ferry in the same locality.

2. Throughout the further consideration of the subject in hand there is, however, an important distinction which must be borne in mind, which underlies the authorities on the subject in a controlling way, but which is seldom referred to therein in express terms. That distinction is that a franchise may be granted as exclusive as against some persons and not as against others. That is to say, a franchise may be, and most often is, granted as exclusive as against all persons other than the sovereign granting it, but not as exclusive in the sense that the sovereign may not itself subsequently exercise or grant to another the right to exercise the same or a similar franchise so near the same locality occupied by that first granted as to interfere with and perhaps wholly to destroy the income enjoyed by the latter from such prior franchise and the investment of capital therein. Consequently, there is a most important and fundamental difference between the rights of holders of franchises in controversies with rival operations, where the latter are not authorized by legislative authority, from the cases where the rival operations are so authorized.

3. In England, even though the ferry franchise is exclusive as against all others not acting under legislative authority, and is derived, not under legislative grant by act

of Parliament, but by grant from the Crown, it is settled by the modern decisions (overruling earlier holdings to the contrary), that in a controversy between the owner of the ferry and a person or corporation erecting and operating a bridge across the same stream so near to the ferry as to draw away its custom, where such bridge is not erected under legislative authority purporting to authorize it without liability for damages, and where the latter does not physically obstruct the approach to or operation of the ferry, the erection and operation of the bridge is not an infringement of the ferry franchise and does not render the owner or operator of the bridge liable in damages to the owner of the ferry, although the practical effect of the operation of the bridge may be to draw away all custom from the ferry, so as to wholly destroy the value of the ferry franchise. *Dibden* v. *Skirrow,* 12 Am. & Eng. Anno. Cas. 252; overruling *Regina* v. *Cambrian,* L. R. 6 Q. B. 422, which is cited in many of the early American cases.

In the United States, however, the weight of authority establishes the doctrine that in a controversy between the owner of a ferry, which is exclusive as against all others not acting under legislative authority and is derived by legislative grant, and a person or corporation, not acting under legislative grant purporting to authorize such action without liability for damages, where a bridge across the same stream is erected and operated by the latter so near to the ferry as to draw away its custom, this will be held to be an infringement of the ferry franchise, although the approaches and operation of the ferry may not be physically obstructed thereby; and such owner or operator of the bridge will be liable in damages to the owner of the ferry for drawing away the custom of the latter. See note to 12 Am. & Eng. Anno. Cas. 252, and American cases cited. In such case the rival bridge is treated in all respects as if it were a rival ferry, which could not at common law have

been so located without liability in damages for drawing away the travel and thereby diminishing the value of the franchise. *Smith* v. *Harkins,* 38 N. C. 613, 44 Am. Dec. 83; *Norris* v. *Farmers, etc., Co.,* 6 Cal. 590, 65 Am. Dec. 535, and authorities therein cited.

This difference between the doctrine on this subject prevailing in England and in the United States may be reconciled in principle by the consideration of the difference between the power of the Crown to grant franchises in derogation of common right and the power of the legislatures of the States in that regard. The power of the former, under consideration, was limited by the common law of England to its exercise for the public benefit. Beyond that no grant from the Crown was valid. Whereas, the power of our State legislatures, where unrestricted by the State Constitutions (and they are generally, if not universally, unrestricted in that behalf), is unlimited, and is as plenary as the power of Parliament in England over the subject. The controlling distinction between the English and American cases referred to, therefore, is this; that, in the former, the private property right in the ferry held under grant from the Crown is limited as aforesaid; whereas such private property right in the ferry held under legislative grant from our States is unlimited, as against a rival ferry or bridge located so near by as to draw away custom of travel from the ferry first established, where the second ferry or bridge is not itself operated under legislative authority as aforesaid. The same rule applies to rival bridges and to a rival ferry to a bridge first established. See authorities above cited.

It should be noted, however, that the American doctrine, referred to, is applicable, (1), only where (as is universally true, of course, in the United States) the franchise for the ferry or bridge first established is derived under legislative authority, and (2), where the later rival ferry or bridge, is

not operated under legislative authority, such as aforesaid. In such case the franchise for the ferry or bridge first established is held, under the American doctrine, to be an exclusive franchise as against all others not acting under the legislative authority aforesaid. *Mason* v. *Harper's Ferry Bridge Co., supra,* 17 W. Va. 396; *Norris* v. *Farmers. etc., Co., supra,* 6 Cal. 590, 65 Am. Dec. 535; *Gates* v. *McDaniel,* 2 Stev. (Ala.), 211, 19 Am. Dec. 49; Note of American authorities in 12 Am. & Eng. Anno. Cas. following the case at p. 252. And the location and operation of a later rival ferry or bridge so near to the first established as to draw away the travel from the latter, by one not acting under legislative authority purporting to authorize such action under the rule of *damnum absque injuria,* will be held not only to *damage* the private property right in the first established ferry or bridge, but to be a *taking* of such private property right, in such prior ferry or bridge, within the constitutional inhibition against the taking of private property for public use without just compensation. *Mason* v. *Harper's Ferry Bridge Co., supra,* 17 W. Va. 396; Lewis on Em. Dom. (2nd ed.) sec. 137 and authorities cited and sec. 228 and note thereto. And the same is true where the later rival ferry or bridge is itself located and operated under legislative authority which does purport to authorize such action under the rule of *damnum absque injuria,* if the prior ferry or bridge was established under a franchise granted by legislative authority as exclusive against the sovereign State, *by the express terms of the grant* (as held by some of the authorities) or *by necessary implication* from *the express terms of the grant* (as held by other authorities). 1 Minor on Real Prop., sec. 69; *Piscataqua Bridge Co.* v. *N. H. Bridge Co.,* 7 N. H. 35; *Chenango Bridge Co.* v. *Binghamton Bridge Co.,* 3 *Wall,* 51, 18 L. Ed. 137; *Power* v. *The Village of Athens,* 99 N. Y. 592, 2 N. E. 609. And such an express grant of an exclusive franchise

as against the sovereign State is a contract between the grantee and the State and any subsequent act of the legislature of the State impairing its obligation is void under the federal Constitution. Lewis on Em. Dom., *supra* (sec. 137) and authorities cited.

While the above is true, it is nevertheless well settled that whether the grant of a franchise (such as that under consideration, to-wit, of a ferry) is exclusive in the sense last above used, is to be determined by the construction of the grant itself. And the rule universally applied by the authorities to such construction is that the grant will be strictly construed against the grantee and in favor of the sovereign; and that such a grant will not be deemed exclusive unless expressly so stated in the grant itself or such conclusion arises by necessary implication from the express language of the grant. Lewis on Em. Dom., *supra,* secs. 136, 138 and authorities cited; also *Tuckahoe Company v. T. & J. R. Co.,* 11 Leigh (38 Va.) 42, 36 Am. Dec. 374; *Charles River Bridge* v. *Warren Bridge,* 11 Pet. 420, 9 L. Ed. 773. And a grant of such a franchise by an act of the legislature, or by a court acting under legislative authority, merely giving the authority to establish and operate a ferry, does not confer an exclusive right, so as to deprive the legislature of power to subsequently authorize another ferry or bridge near the same place, it not being in the same location, without infringing upon the prior grant. Lewis on Em. Dom., *supra,* (sec. 136); *Somerville* v. *Wimbish,* 7 Gratt. (48 Va.) 205; *Bush* v. *Peru Bridge Co.,* 3 Ind. 21; 1 Minor on Real Prop., sec. 69. And the fact that, at the time of the grant of a ferry franchise, there was the general statute (sec. 1386 of Code of Va. above quoted) in existence (which is relied on by appellants), does not change the rule of construction under consideration, as was expressly held in the following cases: *Williams* v. *Wingo,* 177 U. S. 601, 20 Sup. Ct. 793, 44 L. Ed. 905; *Mason* v. *Harper's*

*Ferry Bridge Co., supra,* 17 W. Va. 396; *Somerville* v. *Wimbish, supra,* 7 Gratt. 48 Va., 205.

It is true that in the case of *Mason* v. *Harper's Ferry Bridge Co.,* just cited, it is held that the rival bridge company was compelled to pay damages for diverting tolls from the previously established ferry near by, but this holding was made on the ground that although the bridge company acted also under legislative authority under its charter franchise, such charter, pursuant to the statutes of West Virginia on the subject, was conditioned upon its paying damages of that character. That is to say, there was nothing in the statute law under which the bridge company derived its right to erect and operate the rival bridge which indicated that the legislature intended to grant to it the authority so to do without liability for damages. And such West Virginia case expressly holds that if the legislature had granted the bridge company such authority, it had the power to do so, and, in such case, there would have been no infringement of the prior ferry franchise and no liability on the part of the bridge company in damages therefor.

It is also true that in the case of the *Binghamton Bridge,* 3 Wall. 51, 18 L. Ed. 137, *sub. nom. Chenango Bridge Co.* v. *Binghamton Bridge Co.,* 3 Wall. 51, 18 L. Ed. 137, where the act of the legislature, authorizing the older bridge, contained the proviso "that it should not be lawful for *any person or persons* to erect a bridge within a distance of two miles" (italics supplied), that provision was held to be a part of the contract between the State and the bridge company, but that decision, as pointed out in the subsequent case of *Williams* v. *Wingo, supra,* 177 U. S. 601, 20 Sup. Ct. 793, 44 L. Ed. 905, rests upon the peculiar language of such act of the legislature and, as also pointed out in the last named case, is not in conflict with the holding in such case aforesaid, that the Virginia statute aforesaid (sec. 1386 of the Code) will not be held to be a part of the grant

76

of a ferry franchise made while such statute was in force, so as to confer such franchise as exclusive, as against the power of the legislature to pass a subsequent act authorizing a county to establish a ferry within half a mile of the former ferry.

4. In the instant case the board of supervisors claim that they had legislative authority to take the initial action they did to establish the rival bridge in question under statute (sec. 944-a above cited, and the material portions of which are above quoted), and that, if not, its said action under such statute in the matter of locating and establishing the bridge was validated by the special act of Assembly (Acts, 1916, p. 548, above quoted). We are of opinion that both of such positions are well taken.

The special road law for Giles county (Acts, 1908, p. 611, the material portions of which are above quoted), does not expressly repeal said section 944-a so far as applicable to the taking of initial action for the establishment and location of new bridges in Giles county; and, in view of the provision of such special road statute above quoted (and especially of section 13 thereof), we are of opinion that it did not do so by necessary implication (such action of the board of supervisors not undertaking or purporting to extend to the condemnation of land for use for the location of the bridge, or for its approaches, jurisdiction over which matters is conferred on boards of supervisors by said section 944-a as the general law of the State). And we are of opinion that the latter jurisdiction was taken away from the board of supervisors of Giles county, by necessary implication, by the special road law aforesaid, and such jurisdiction was thereby conferred on the road commission of such county aforesaid.

In other words, there are a number of things needful to be done before the public is furnished with the use of a public bridge at a location where one has not before existed,

among which are the following: (1) The determination that such a bridge should be established and its location; (2) the determination of the plans and specifications for the bridge and its approaches; (3) the location of the approaches as they recede from the bridges; (4) the acquisition or condemnation of the right of way for the bridge and its approaches; (5) the erection of the bridge and its approaches; and (6) the direction or supervision of the work of the erection of the bridge and its approaches. It appears from a comparison of the special road law for Giles county with the general statute law of the State aforesaid as to roads and bridges, that the initial determination of the matters mentioned under headings (1) and (2) and the matter mentioned under the heading (5), subject to the limitation that the "direction" or supervision, mentioned under heading (6), must be under the road commissioner (or commissioners) in whose district the subject of it may be located, are left under the jurisdiction of the board of supervisors; whereas the matters mentioned under the headings (3) and (4) are transferred to the said road commission. By the powers given the latter, however, in the matters last referred to, such commission is, in effect, given a veto power upon the establishment and location of such bridge. When any land owner affected is summoned before the road commission "to show cause against" the road which will be occupied by the bridge, or will be needed for its approaches, "the expediency or propriety of establishing" the bridge and the location of it, is inseparably involved in the expediency and propriety of establishing the road, and the initial decision of those questions which may have been made by the board of supervisors is, in effect, again in issue before the road commission upon their undertaking to act in the further matters touching the condemnation of the right of way for the bridge and for its approaches. Thus, under such special road law, the proceed

ings to establish such a bridge cannot be initiated before the road commission, but must be initiated before the board of supervisors. On the other hand, the board of supervisors cannot proceed further than the exercise of their initial jurisdiction aforesaid. The further steps necessary to carry such action into practical effect must be taken, if at all, before the road commission. It is before the latter that the land owners affected are summoned. Their rights are not affected by any action the board of supervisors may take in the premises favorable to the establishment of or as to the location of the bridge. They have their day in court before the road commission on those subjects, as well as upon the quantum of damages which may be allowed them by the road commission.

5. Therefore, we are of opinion that since the board of supervisors and road commission acted under legislative authority, authorizing, and, as to the former, also validating, their action in locating and establishing the bridge, together with its approaches, in question, such bridge (with its approaches), in so far as they do not physically obstruct the approaches to the ferry of appellants, did not infringe upon the property rights of appellants in said ferry, and hence will not, by its drawing away the custom in public travel from such ferry, even though it result in the total withdrawal of such custom therefrom, *take,* or *damage,* the property of appellants within the meaning of section 58 of the Constitution of Virginia.

6. There is no evidence in the cause tending to show that either of the approaches to the landings of said ferry will be in any way obstructed by said bridge or by its approaches. On the contrary, the bridge itself does not touch either of the approaches to said ferry. And as appears in detail from the above statement of the case, the approach to the bridge on the eastern side of the river, as being constructed at the time of the trial in the court below in ac-

cordance with the only plans, which the evidence in the cause tends to show were decided upon, will not, as shown by the evidence for appellees, in any way physically obstruct the approach to the landing of said ferry on the eastern side of the river. There is no evidence for appellants tending to controvert this. Their evidence on this subject is to the effect that some prior and different plans for the approach to the bridge on the eastern side of the river were considered by the board of supervisors when its purpose was to locate the bridge at a different point on the river, (to-wit, about 272 feet below said ferry on the eastern side of the river) from that finally determined upon (to-wit, 195 feet below such ferry on the eastern side of the river) : but which plans were never acted upon nor intended to be acted upon after such last named location of the bridge was decided on. Such evidence was, therefore, immaterial and could not serve to controvert the evidence for appellees on the subject.

Moreover, the extent of the contemplated works in constructing the approach to the bridge on the eastern side of the river was fixed by the action of the road commission under the special road law of Giles county aforesaid by the condition which they annexed to their establishment of the road (which condition was afterwards assented to by the board of supervisors). The extent of such contemplated works, as thus limited, fixed also the extent of the right of appellants to damages for their land so taken and for damages to the remainder of their tract of land thus partly taken, including the damages, if any, to their adjacent ferry landing on such remainder of land, which would be occasioned by any physical obstruction of the public road approach to such ferry landing. As shown by the report of the road commission made under such special road law, quoted in the above statement of the case, they refer to the location of the land taken, which extended from the exist-

ing public road, as a new right of way, to the location of the bridge as finally decided upon, as aforesaid; and which new right of way was being condemned for the construction of the approach to the bridge at its eastern end (as well as for the abutment, pier and overhang of the eastern half of the bridge), as "a public road 30 feet in width," and state that—"It is expressly understood that the establishment of this (new) road shall. not be construed to discontinue the present road to the Snidow (appellants) ferry landing, but said (present) road shall be left open so as not to interfere with the public travel to and from said ferry." The board of supervisors, when they subsequently contracted for the construction of such approach to the bridge, did so by plans and specifications which conformed to such condition annexed to their establishment of the road by the road commission.

Therefore, no question of damages to appellants by reason of any physical obstruction of the public road approach to their ferry landing on the eastern side of the river (nor indeed to the approach to their landing on the western side of the river as we shall presently see), was ever put in issue in the instant case.

Should the actual construction of the approach to the bridge physically obstruct the public road approach to either the eastern or western ferry landing of appellants and no other reasonably equally convenient public road approach or approaches thereto be provided, so as to prevent such obstruction, the proceedings in the instant cause will furnish no bar against the appellants in the future asserting in such a proceeding as may be authorized by law, their right to operate their ferry free from physical obstruction to its approaches, or to the recovery of proper damages for any injury which may be occasioned by such obstruction.

There is no evidence in the case tending to show that the

end of the bridge on the western side of the river, or its pier, or abutment, or approach thereto, as it was finally located, about 100 feet below the landing of said ferry on that side of the river, (instead of about 154 feet below such landing as at first contemplated) would physically obstruct the approach of such ferry landing.

7. We are, therefore, of opinion that there was no error in the action of the trial court in giving the instruction complained of (quoted in the above statement of the case) which excluded from the jury any consideration of any question of damages to the ferry, or to the ferry franchise, or to the ferry rights of way; nor in the admission or exclusion of evidence on that subject.

Two other assignments of error by appellants remain for our consideration, which are not covered by what has been said above.

8. As set forth in detail in the statement of the case above, it is urged in section (b) of the grounds of appellants' demurrer to and motion to quash the original proceedings in the case that in establishing said road and in allowance of damages, the road commission had no authority to act alone as they did, and not in conjunction with the district board of road commissioners for another (Pearisburg) district of Giles county, in which the western end of the bridge, and its approach at that end, were located on the western side of New river. As to this, it is deemed sufficient to say that the application for the new road in the case before us, and which alone affected the appellants, was not "in more than one district," but wholly in the district of the road commission (appellees in this case), and hence the latter were authorized by the special road law of Giles county aforesaid to act as they did. The provision of such act relied on by appellants, which provides, in substance, that if the application aforesaid be for a new road or changing of an existing road which is "in more than one

district," that the road commission "of any other district affected" shall also be convened by the summons to be issued by the clerk to be present at the time and place of the initial meeting of the road commission to whom such application is made, has no application, therefore, to the instant case. And even if such provision had application to the instant case, it did not affect the jurisdiction given by said special act to the road commission of Pembroke district, to whom said application was made, over appellants and the condemnation of their land located wholly in the district of such road commission, and gave only to the road commission of the Pearisburg district west of the river a right to be present at such meeting, for the denial of which right the latter only could complain.

9. What we have said above sufficiently disposes of the other grounds of appellants' demurrer to and motion to quash the proceedings in the case, except the following sole remaining position of appellants to be now considered.

It is urged that the appellants have been deprived of due process of law because they were summoned to appear before the road commission to show cause only against the road proposed to be located in accordance with the petition of John F. Williams and others (quoted in the above statement of the case) which road, as therein expressly designated, was proposed to be located about 275 to 300 feet below the ferry landing aforesaid on the eastern side of the river and was to be located so as to extend from the existing public road to the then proposed location of the eastern end of the proposed bridge and would not pass over or take any land of the appellants; and that hence appellants were given no notice by such summons to show cause against the road as subsequently located by the road commission, at an adjourned meeting thereof, at a location different from that first proposed as aforesaid and which placed it only 195 feet below said ferry landing and across a portion of the land of appellants.

This position ignores the provisions in said special road law for Giles county, which are quoted in the above statement of the case, which practically constituted the road commission a court, with power of adjournment from time to time and from place to place, and conferred upon it the jurisdiction to disregard the route of the road proposed in the application therefor and to choose and establish a wholly different location therefor. Appellants having been duly summoned before the road commission at the time and place of their initial meeting were thereby duly made parties to all the subsequent proceedings of the road commission; were thus given their day in court; and were bound by such proceedings, under the provisions of such special road law, except as they might be relieved therefrom upon appeal taken in accordance therewith. Thus were the appellants afforded due process of law, including a trial by jury as provided for in such statute. And although it may have been true in the instant case that the appellants did not have *actual* but only *constructive notice* of the change in the location of the road aforesaid made by the road commission at their adjourned meeting at the time of such action; and not only was that sufficient, but the appellants soon afterwards also had *actual notice* of such action of the road commission, and appealed therefrom to the circuit court; and appellants had a trial *de novo* on such appeal, which gave them due process of law in the court below upon the trial there of all the issues in the case. So that in no aspect of the case do we feel that there is any merit in the position of appellants which we have now under consideration.

Upon the whole, therefore, we find no error in the judgment complained of and it will be affirmed.

*Affirmed.*